### ELLIS v. UNITED STATES.

### EASTERN DREDGING COMPANY v. UNITED STATES.

### SAME v. SAME.

### SAME v. SAME.

### BAY STATE DREDGING COMPANY v. UNITED STATES.

### SAME v. SAME.

### SAME v. SAME.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

Nos. 567, 664, 665, 666, 667, 668, 669.   Argued April 23, 24, 1907.—Decided May 13, 1907.

The provisions in the act of August 1, 1892, 27 Stat. 340, limiting the hours of laborers and mechanics employed by the United States or any contractor or subcontractor upon any of the public works of the United States to eight hours per day except in cases of extraordinary emergency, and imposing penalties for the violation thereof, are constitutional and within the powers of Congress. In this respect Congress has the same power as a State has over the construction of its public works. *Atkin* v. *Kansas*, 191 U. S. 207.

An act of Congress otherwise valid is not unconstitutional because the motive in enacting it was to secure certain advantages for conditions of labor not subject to the general control of Congress.

Although, in the absence of special laws, the Government, purely as a contractor, may stand like a private person, it does not, by making a contract, waive its sovereignty or give up its power to make laws which render criminal a breach of the contract.

The disappointment of a contractor with regard to obtaining some of his materials did not, under the circumstances of this case, amount to an extraordinary emergency within the meaning of the statute and justify him in having laborers work more than eight hours.

One who intentionally adopts certain conduct in certain circumstances known to him, which conduct is unlawful, intentionally breaks the law.

Persons employed on dredges and scows, in dredging a channel in a harbor are not within the meaning of the act of August 1, 1892, laborers or mechanics employed on any of the public works of the United States.

THE facts are stated in the opinion.

*Mr. D. T. Watson*, for plaintiff in error Ellis, submitted:

The right of the individual to dispose of his labor upon such terms as he deems best, is undoubted, and admitted in *Atkin*

v. *Kansas*, 191 U. S. 223. If he may dispose of it at all, then the extent of the disposition is a matter optional with himself. The men who worked on the pier did so voluntarily. The sole crime of Ellis was that he did not forcibly restrain them from the work.

The great weight, if not the universal voice of authority, is to the effect that an adult may, if he sees fit, engage for what time he sees fit in ordinary employments not dangerous, hazardous or injurious to life, limb or health, and he has that right, as part of his liberty. Under the Preamble of the Federal Constitution, and Article V of the Amendments the power delegated by the people to the Congress does not include the power to deprive him of his liberty. *Lochner* v. *New York*, 198 U. S. 53.

The laborer can work nowhere unless employed. He works under contract. To take from him one of the places where he may work over eight hours, public work, even if the contractor is willing to employ him, deprives him of part of his liberty and is unconstitutional. *People* v. *Orange Co.*, 175 N. Y. 84; Articles in Central Law Journal, No. 11, pp. 147, 163, 181, 198; No. 58, 361; *Allgeyer* v. *Louisiana*, 165 U. S. 578, 591; *Holden* v. *Hardy*, 169 U. S. 366, 391; *Williams* v. *Fears*, 179 U. S. 270, 274; *Butchers' Union* v. *Crescent City*, 111 U. S. 746–757.

There is no pretense in the present case that the kind of work done was hazardous—or unhealthy—or in any way dangerous to life or limb. It was not of a class with such cases as *Holden* v. *Hardy*, 169 U. S. 366.

It is one thing to hold that a State or municipality may by contract restrict the hours of labor, for by entering into the contract each person waives his right to the constitutional protection. It is entirely another thing to make it a crime for a man to insist on his constitutional right to labor more than eight hours a day.

The Act of 1892 is constitutional in so far as it prohibits the Departments from contracting for more than eight hours' labor per day on public works, but it is unconstitutional in so far as it makes it a crime for one who has come into contractual rela-

tions with the Government for that public work to permit some other man to work more than eight hours per day.

In this case Ellis simply permitted two men to work more than eight hours a day. He did not force them to work more than eight hours a day; he owed no duty to the Government to enforce its laws as a police officer or a sheriff. His relation to the Government was only and solely contractual so far as the pier was concerned; his contract did not contain any covenant that he was to oversee and prevent men from working on the pier more than eight hours a day, or if it did, if it be said that the Act of 1892 is read into Ellis's contract with the Government and made part of it, and Ellis agrees to enforce the act so far as the pier is concerned, still his relations with the Government are contractual and contractual only.

*Mr. Edward E. Blodgett*, with whom *Mr. G. Philip Wardner* was on the brief, for the Eastern Dredging Company:

Men engaged in dredging a channel in Boston Harbor cannot be said to be employed upon any of the public works of the United States or of the District of Columbia. As to what are "public works" see Century Dictionary, p. 4830. *Ellis* v. *Common Council of Grand Rapids*, 123 Michigan, 567; *Winters* v. *Duluth*, 82 Minnesota, 127; Am. & Eng. Ency. of Law, 2d ed., Vol. 23, p. 459.

The performance by the United States Government of any of its governmental functions may be said to be public work; but no one can be said to be employed on the public works of the United States unless he is employed upon some physical, tangible structure actually made or erected by the hand of man, and the property of the United States Government.

The place where the dredging was being done was not owned by and had never been ceded to the Government of the United States, and was not under its control, except so far as the navigable waters of Boston Harbor were under its control.

The persons alleged in the informations to have been employed in violation of law were not laborers or mechanics.

The tug, the dredge and the scow were clearly vessels within the admiralty jurisdiction of the United States.

As concerns the tug, there can of course be no dispute.

Nor is there room for any doubt in relation to the dredge and scow.

The word vessel includes every description of water craft or other artificial contrivance used or capable of being used as a means of transportation on water. Rev. Stat., § 3. By § 4612, Rev. Stat. it is provided that in the construction of Title 53 of the Revised Statutes relating to merchant seamen " The term ' vessel ' shall be understood to comprehend every description of vessel navigating on any sea or channel, lake or river, to which the provisions of this Title may be applicable."

In reality the dredge and the scows are to be regarded as one plant or instrument for dredging and transporting mud. But even if they be regarded separately, it still appears that the scows were used for transporting mud, and that the dredge was used for transporting her crew and the dredging equipment necessary to dig up the mud and put it into the scows, and therefore are both vessels as known to the law. *The General Cass*, Brown, Adm., 334; s. c. Fed. Cas. No. 5307 (Scow); *Endner* v. *Greco*, 3 Fed. Rep. 411 (Scows); *The Alabama*, 19 Fed. Rep. 544, aff'd. 22 Fed. Rep. 449 (Dredge and Scows); *The Pioneer*, 30 Fed. Rep. 206 (Dredge); *Disbrow* v. *Walsh Bros.*, 36 Fed. Rep. 607 (Barge); *The Atlantic*, 53 Fed. Rep. 607 (Dredge); *The Starbuck*, 61 Fed. Rep. 502 (Dredge); *The International*, 83 Fed. Rep. 840 (Dredge and Scows); *Lawrence* v. *Flat-boat*, 84 Fed. Rep. 200 (Flat-boat with pile-driver); *McRae* v. *Bowers Dredging Co.*, 86 Fed. Rep. 344 (Dredge); *Steam Dredge No. 1*, 87 Fed. Rep. 760 (Dredge); *McMaster* v. *One Dredge*, 95 Fed. Rep. 832 (Dredge); *Bowers Hydraulic Dredging Co.* v. *Federal Contracting Co.*, 148 Fed. Rep. 290 (Dredge).

If the tug, the dredge and the scows were vessels, then the men employed to operate them were seamen.

There will, of course, be no dispute about the master and mate of the tug. Curtis' Merchant Seamen, p. 5; Benedict

Adm. Práct., 3d. ed, § 278; Hughes on Adm.; p. 21.  The law is equally clear as to the engineer and fireman on the tug. *Wilson* v. *The Ohio*, Gilpin, 505; *Gurney* v. *Crockett*, Abbott's Adm. 490.

The others—namely, the master, fireman, cranesman, and deck hands on the dredge, and the scowman—are seamen, for the reason that they were each of them one of the crew of the vessel on which they were employed, and they each of them co-operated in the operation, maintenance, and navigation of these vessels.

*Mr. W. Orison Underwood*, with whom *Mr. Henry F. Knight* was on the brief, for Bay State Dredging Company.

*The Solicitor General, the Attorney General* and *Mr. Otis J. Carlton*, Special Assistant to the Attorney General, for the United States:

1. The Act of August 1, 1892, chapter 352 (27 Stat. 340), known as the eight-hour law, is constitutional.

The first eight-hour law, act of June 25, 1868, chapter 72 (15 Stat. 77) was twice before this court, but in neither case was it necessary to pass on its validity. *United States* v. *Martin*, 94, U. S. 400; *United States* v. *Driscoll*, 96 U. S. 421. In those cases the statute was considered as in the nature of a direction from a principal to his agent that eight hours is the proper length of time for a day's work: contracts fixing a different length of time are legal (*Martin's case, supra*); and the statute does not apply to the employés of independent contractors (*Driscoll's case, supra*). The act of 1892 was passed because of the interpretation given to the act of 1868 in those cases and the absence of a penal provision, preserving the principle of the prior statute, to insure its effective execution. The validity of neither act has ever been questioned. *United States* v. *Ollinger*, 55 Fed. Rep. 959; *United States* v. *Jefferson*, 60 Fed. Rep. 736; *United States* v. *John Kelso Company*, 86 Fed. Rep. 304; *United States* v. *San Francisco Bridge Company*, 88 Fed. Rep. 891; Opin. A. G. 530; 13 *ib.* 29, 424; 14 *ib.* 37, 128; 16 *ib.*

58; 17 *ib*. 341; 18 *ib*. 389; 20 *ib*. 445, 454, 459, 487, 500; 21 *ib*. 32; 25 *ib*. 441, 465; 26 *ib*. 1, 30, 36, 64. In 25 Opin. A. G. 441, 444, the theory upon which this law was passed is well stated—that the Government, as an employer of labor, may dictate the terms upon which its work shall be conducted. Cases like *Lochner* v. *New York*, 198 U. S. 53, may be distinguished because the act of 1892 does not interfere with the conduct of private business; it merely prescribes the terms upon which the Government will permit labor to be employed upon its public works. Section 3 expressly limits the operation of the act to contracts entered into after its passage. *Atkin* v. *Kansas*, 191 U. S. 207, holding valid a state eight-hour law precisely similar to act of 1892 under the Fourteenth Amendment, which is like the Fifth Amendment, upon which appellants rely, is absolutely controlling.

2. Deepening a channel is "public works of the United States." The very work upon which the dredging companies were engaged was authorized by statutes defining the work, in their titles and enacting clauses, as public works. Act June 13, 1902, chapter 1079 (32 Stat. 331, 332), act March 3, 1905, chapter 1482 (33 Stat. 1118). Ellis's work was authorized in an appropriation act under subhead, "Public Works." 33 Stat. 1092, 1101. Before and since 1892 works of a character like those upon which each of the appellants was engaged have been denominated public works by Congress. 20 Stat. 152, 363; 21 Stat. 8, 180, 468; 22 Stat. 191; 24 Stat. 310, 581, 584; 25 Stat. 400, 462, 813; 26 Stat. 193, 426, 803; 27 Stat. 88, 240, 721; 28 Stat. 130, 831; 29 Stat. 202, 367, 654; 30 Stat. 377, 1030, 1121; 31 Stat. 692, 1116; 32 Stat. 331; 33 Stat. 333, 1101, 1117. Congress, even by later enactments, may define terms of other acts. *Johnson* v. *The Southern Pacific Company*, 196 U. S. 1, 21, and cases cited. In *United States* v. *Jefferson*, 60 Fed. Rep. 736, removing obstructions to navigation was held to be public works. That dredging is public work, see 26 Opin. A. G. 30, 34; 23 *ib*. 174, 176. It is immaterial that a State has political jurisdiction over the place where the works are being con-

structed. *United States* v. *San Francisco Bridge Company*, 88 Fed. Rep. 304. ·

3. The exception "in case of extraordinary emergency" only applies to sudden, unexpected happenings not of the customary, usual, or regular kind, demanding prompt action to avert imminent danger to life, limb, health or property; urgent situations which can be foreseen in time to avoid the necessity of overtime work must be guarded against solely by putting additional shifts at work; and possibility of pecuniary loss is not enough to justify continuously working men overtime. See definitions of "emergency" and "extraordinary" in Century Dictionary, Standard, Webster, Worcester. Debates, Cong. Rec., vol. 23, pages 5724, 5728, 5729; vol. 23, Appendix, pages 452 *et seq.*; and the Senate and House Reports accompanying H. R. 8537. Debates and reports of committees which will be examined to find the situation as it existed at the time the act of 1892 was under consideration and was pressed upon the attention of Congress. *United States* v. *Union Pacific Railroad*, 91 U. S. 72, 79; *Church of the Holy Trinity* v. *United States*, 143 U. S. 457; *United States* v. *Laws*, 163 U. S. 258; *American Net and Twine Company* v. *Worthington*, 141 U. S. 468; *Dunlap* v. *United States*, 173 U. S. 65, show that the purpose of Congress was to secure better citizens by promoting the educational, social and moral elevation of the industrial classes. · The exception to the law will not be construed so as to defeat the purposes of Congress. *People* v. *Waring*, 64 N. Y. Suppl. 865; 52 App. Div. N. Y. 36, may be distinguished.

4. The application of the term "laborers and mechanics" to employés engaged in ordinary dredging operations upon the ordinary non-seagoing dredge and attendant tugs and scows.

a. The term applies to all who come within the ordinary meaning of the words, irrespective of the manner in which they are paid. 12 Opin. A. G. 530, 533; 25 Opin. A. G. 465. See, also, 18 Opin. A. G. 389, 391. 14 Opin. A. G. 128, stating that act of 1868 is limited to employés paid a day's wages for a day's work, and *Billinsley* v. *Marshall County*, 5 Kan. App. 435,

where there is a similar intimation, will not be followed, for to construe the act of 1892 as limited to employés paid by the day would enable the purpose of the act to be defeated by paying weekly or monthly wages.

b. The ordinary meaning of the term includes employés on the dredge and the scowman. Deck hands, while engaged upon the work of removing obstructions to navigation, are laborers within act of 1892. *United States* v. *Jefferson,* 60 Fed. Rep. 736. Fireman on land (*United States* v. *Martin,* 94 U. S. 400) and on board ship (*Wilson* v. *Zulueta,* 14 Q. B. 405) are laborers. See, also, 26 Opin. A. G. 64. Locomotive engineers are mechanics. *Sanner* v. *Shivers,* 76 Georgia, 335; *State ex rel. I. X. L. Grocery Company* v. *Land,* 108 Louisiana, 512. Application of the act of 1892 to Government Printing Office (25 Stat. 57; 28 Stat. 607) shows that word "mechanics" applies to those engaged in operating and tending machines.

c. Employés named are not seamen. If their employment can be said to be so peculiar as to take them out of the act it is only while the dredge is being towed from port to port. A dredge fixed in position and operating upon an excavation under water is like a land steam shovel operating on land. Cases holding dredges and scows to be vessels (*The International,* 89 Fed. Rep. 484) rest upon definition of "vessel." Rev. Stats. § 3. Properly speaking, they are not vessels. *United States* v. *The Ohio,* 27 Fed. Cas. No. 15,915; *United States* v. *The Pennsylvania Canal Boat,* 27 Fed. Cas. No. 16,027.

d. These views are supported by considering evils designed to be remedied by the statute. Committee reports and debates show that, during the thirty years preceding 1892, there had been so many mechanical inventions brought into use that the labor market had become congested and there was not sufficient remunerative employment for all who wished to work. By its definitions of "public works" it is clear that Congress intended the act of 1892 to apply to dredging operations; and in view of the evil which the statute was designed to cure, none of those upon the labor-saving device known as a dredge, who come

within the ordinary meaning of "laborers and mechanics" can be worked overtime lawfully, upon ordinary occasions.

e. Executive interpretation of act of 1892 cannot control because meaning of the statute is plain and unambiguous. *Houghton* v. *Payne,* 194 U. S. 88, 100. The action of the War Department, which down to July, 1906, did not consider that the act of 1892 applied to employés on government dredges, is now abandoned as to deck hands and some others, and it was founded, upon a misconception of an opinion by Attorney General Miller (20 Opin. A. G. 459). His opinion that the act of 1892 does not apply to "sailors or others on shipboard" does not refer to dredges; the question before him related only to those on "vessels;" dredges are not properly classed as vessels nor are their employés to be regarded as sailors during the performance of an ordinary dredging operation. The action of the War Department is now partly abandoned and is no longer insisted on. See, orders, memoranda, letters, etc., in appendix to brief, showing fully the past and present attitude of the War Department. Since passage of the act of August 13, 1894 (28 Stat. 278), requiring contractors upon the public works to give bonds for the protection of persons furnishing materials and labor, contractors upon dredging works have been required to give bonds.

MR. JUSTICE HOLMES delivered the opinion of the court.

These are an indictment and informations under the Act of August 1, 1892, c. 352, 27 Stat. 340, "Relating to the Limitation of the Hours of Daily Service of Laborers and Mechanics Employed upon the Public Works of the United States and of the District of Columbia." They all bring up the question of the constitutionality of the act, and they severally present some subordinate matters, which will be considered under the respective cases.

The act limits the service and employment of all laborers and mechanics employed by the United States, by the District

of Columbia, or by any contractor or subcontractor upon any of the public works of the United States or the District, to eight hours in any one calendar day, and makes it unlawful "to require or permit any such laborer or mechanic to work more than eight hours in any calendar day except in case of extraordinary emergency." By § 2 "any officer or agent of the Government of the United States or of the District of Columbia, or any contractor or subcontractor whose duty it shall be to employ, direct, or control any laborer or mechanic employed upon any of the public works of the United States or of the District of Columbia who shall intentionally violate any provision of this act, shall be deemed guilty of a misdemeanor, and for each and every such offense shall upon conviction be punished by a fine not to exceed one thousand dollars or by imprisonment for not more than six months, or by both such fine and imprisonment, in the discretion of the court having jurisdiction thereof." The plaintiffs in error were contractors within the scope of the act, were found guilty and were fined. They all requested rulings that the act was unconstitutional, excepted to the refusal so to rule, and on that ground brought their cases to this court.

The contention that the act is unconstitutional is not frivolous, since it may be argued that there are relevant distinctions between the power of the United States and that of a State. But the arguments naturally urged against such a statute apply equally for the most part to the two jurisdictions, and are answered, so far as a State is concerned, by *Atkin* v. *Kansas,* 191 U. S. 207. In that case a contractor for work upon a municipal boulevard was sentenced to a fine under a similar law of Kansas, and the statute was upheld. We see no reason to deny to the United States the power thus established for the States. Like the States, it may sanction the requirements made of contractors employed upon its public works by penalties in case those requirements are not fulfilled. It would be a strong thing to say that a legislature that had power to forbid or to authorize and enforce a contract had not also the power to

make a breach of it criminal, but however that may be, Congress, as incident to its power to authorize and enforce contracts for public works, may require that they shall be carried out only in a way consistent with its views of public policy, and may punish a departure from that way. It is true that it has not the general power of legislation possessed by the legislatures of the States, and it may be true that the object of this law is of a kind not subject to its general control. But the power that it has over the mode in which contracts with the United States shall be performed cannot be limited by a speculation as to motives. If the motive be conceded, however, the fact that Congress has not general control over the conditions of labor does not make unconstitutional a law otherwise valid, because the purpose of the law is to secure to it certain advantages, so far as the law goes.

One other argument is put forward, but it hardly needs an answer. A ruling was asked in Ellis's case, and is attempted to be sustained, to the effect that the Government waived its sovereignty by making a contract, and that even if the Act of 1892 were read into the contract, a breach of its requirements would be only a breach of contract and could not be made a crime. This is a mere confusion of ideas. The Government purely as contractor, in the absence of special laws, may stand like a private person, but by making a contract it does not give up its power to make a law, and it may make a law like the present for the reasons that we have stated. We are of opinion that the act is not contrary to the Constitution of the United States.

We pass to the subordinate matters not common to all the cases. In Ellis's case the plaintiff in error agreed to construct and complete pier No. 2 at the Boston Navy Yard, within six months, according to certain specifications and at a certain price. He found more difficulty than he expected, although he expected some trouble, in getting certain oak and pine piles called for by the contract, and, having been delayed by that cause, he permitted his associate in the business to employ men for nine hours, in the hurry to get the work done. The

judge instructed the jury that the evidence did not show an "extraordinary emergency" within the meaning of the act. The judge was right in ruling upon the matter. Even if, as in other instances, a nice case might be left to the jury, what emergencies are within the statute is merely a constituent element of a question of law, since the determination of that element determines the extent of the statutory prohibition and is material only to that end. The ruling was correct. It needs no argument to show that the disappointment of a contractor with regard to obtaining some of his materials, a matter which he knew involved some difficulty of which he took the risk, does not create such an emergency as is contemplated in the exception to the law. Again, the construction of the pier was desirable for the more convenient repair of warships, but it was not essential. Vessels had been docked without it since 1835 or 1836, so that there was no hot haste on that account, if under any circumstances that kind of need would have been enough.

There is only one other question raised in Ellis's case. It is admitted that he was a contractor within the meaning of the act and that the workmen permitted to work more than eight hours a day were employed upon "public works," and it is not denied that these workmen were "mechanics." The jury were instructed, subject to exception, that if the defendant intended to permit the men to work over eight hours on the calendar day named he intended to violate the statute. The argument against the instruction is that the word "intentionally" in the statute requires knowledge of the law, or at least that to be convicted Ellis must not have supposed, even mistakenly, that there was an emergency extraordinary enough to justify his conduct. The latter proposition is only the former a little disguised. Both are without foundation. If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent. The judgment in this case must be affirmed.

The three cases against the Eastern Dredging Company were informations for employing certain men, alleged to be laborers or mechanics, more than eight hours a day upon what was alleged to be one of the public works of the United States, viz., dredging a portion of the thirty-five foot channel, so called, in Boston Harbor. The cases against the Bay State Dredging Company were similar, except that the place was Chelsea Creek in Boston Harbor. Of the former, No. 664 was in three counts for employing two deck hands and an assistant craneman and deck hand upon a dredge; No. 665 was for employing the master, craneman and fireman of the dredge; and No. 666 was for employing the captain, mate, engineer, and foreman of a tug that towed a scow, etc., and a man in charge of the scow. Of the Bay State Dredging Company cases, No. 667 was for employing the captain, mate and fireman of a dredge; No. 668 was for employing a craneman and deck hand on the dredge; and No. 669 was for employing a scowman and the captain and engineer of a tug. The offenses were admitted or proved subject to the questions that already have been considered, and to the further questions whether the dredging was upon one of the public works of the United States and whether the persons employed were laborers or mechanics within the meaning of the act, with one or two lesser points that will not need to be discussed.

Both of the phrases to be construed admit a broad enough interpretation to cover these cases, but the question is whether that interpretation is reasonable, and, in a penal statute, fair. Certainly they may be read in a narrower sense with at least equal ease. The statute says, "laborers and mechanics . . . employed . . . upon any of the public works." It does not say, and no one supposes it to mean, "any public work." The words "upon" and "any of the," and the plural "works" import that the objects of labor referred to have some kind of permanent existence and structural unity, and are severally capable of being regarded as complete wholes. The fact that the persons mentioned as employed upon them are laborers and

mechanics, words admitted not to include seamen, points in the direction of structures and away from the sea. The very great difficulty, if not impossibility, of dredging in the ocean, if such a law is to govern it, is a reason for giving the defendants the benefit of a doubt; and the fact that until last year the Government worked dredging crews more than eight hours is a practical construction not without its weight. A change seems to have been made simply for the sake of consistency between the different departments of the Government, as is stated in an order of the Secretary of War. A different conclusion is sought to be drawn from some appropriation acts, but they simply refer to the improvement of harbors in general terms among the public works for which appropriations are made. The improvement of a harbor may consist in the erection of structures as well as in the widening of a channel, or the explosion of a rock. It is unnecessary to lay special stress on the title to the soil in which the channels were dug, but it may be noticed that it was not in the United States. The language of the acts is "public works of the United States." As the works are things upon which the labor is expended, the most natural meaning of "of the United States" is belonging to the United States.

The words laborers and mechanics are admitted not to apply to seamen as that name commonly is used. Therefore it was contended but faintly that the masters of the tugs could not be employed more than eight hours. But the argument does not stop with masters of tugs, or even with mates, engineers and firemen of the same. *Wilson* v. *The Ohio*, Gilpin, 505; *Holt* v. *Cummings*, 102 Pa. St. 212. The scows and floating dredges were vessels. Rev. Stat. §§ 3, 4612. They were within the admiralty jurisdiction of the United States. *The Robert W. Parsons*, 191 U. S. 17. (A number of cases as to dredges in the Circuit and District Courts are referred to in *Brown Hydraulic Dredging Co.* v. *Federal Contracting Co.*, 148 Fed. Rep. 290.) Therefore all of the hands mentioned in the informations were seamen within the definition in an earlier statute of the

United States. Rev. Stat. § 4612; *Saylor* v. *Taylor*, 77 Fed. Rep. 476; *S. C.*, 23 C. C. A. 343. See also Act of March 3, 1875, c. 156, § 3; 18 Stat. 485; *Bean* v. *Stupart*, 1 Dougl. 11; *Disbrow* v. *The Walsh Brothers*, 36 Fed. Rep. 607. They all require something of the training and are liable to be called upon for more or less of the services required of ordinary seamen. The reasons which exclude the latter from the statute apply, although perhaps in a less degree, to them. Whatever the nature of their work it is incident to their employment on the dredges and scows as in the case of an engineer or coal shoveller on board ship. Without further elaboration of details we are of opinion that the persons employed by the two defendant companies were not laborers or mechanics and were not employed upon any of the public works of the United States within the meaning of the act. As in other cases where a broad distinction is admitted, it ultimately becomes necessary to draw a line, and the determination of the precise place of that line in nice cases always seems somewhat technical, but still the line must be drawn.

*Judgment in* 567 *affirmed.*
*Judgments in* 664, 665, 666, 667, 668 and 669 *reversed.*

Mr. Justice Moody took no part in the decision of 567.

Mr. Justice McKenna is of opinion that the work upon the dredging of Chelsea Creek was within the act. In other particulars he agrees with the judgment of the court.

Mr. Justice Moody dissenting in Nos. 664, 665, 666, 667, 668 and 669.

I am unable to agree with the opinion of the court, so far as it relates to the employment for more than eight hours a day of the men engaged in work on the dredges and scows. The cases are of such general importance that I am unwilling to allow the reasons for my disagreement to remain undisclosed.

The first question is whether the men named in the informations were employed by the defendants "upon any of the public works of the United States" within the meaning of those words as Congress used them. Let it be conceded, as I think it should be, that "any of the public works" is a narrower expression than "any public work" would be; that public works must "have some kind of permanent existence and structural unity and be severally capable of being regarded as complete wholes," and still the works here in question fall within the description. The dredging of channels in our waterways is not mere digging. It has for its purpose the creation of something with as visible a form as a cellar to a house, a sunken road, a well, a tidal basin or a sea-level canal. Surely all these are "works;" and if constructed by the Government, "public works." Artificial waterways may not be so easily read out of the statute by any definition, and I cannot resist the belief that the definition accepted in the opinion of the court does not accomplish it.

Let us consider the history of one of these artificial approaches from the sea, such as the channel in Boston Harbor, and see whether, when it is completed, it ought not to be regarded as a complete whole, having a permanent existence and structural unity. When a work of this kind is proposed the engineers of the Army, first obtaining the authority from Congress, survey the region, consider the commercial reasons which support the project and make plans for it and estimates of its cost. Upon consideration of the engineers' report, Congress, if it approves the project, makes an appropriation for its construction, designating it expressly as of the "public works" of the United States. For example, the appropriation for one of the works in question in these cases is in the following terms: "The following sums of money . . . . are hereby appropriated . . . for the construction . . . of the public works hereinafter named; . . . . For improving said harbor in accordance with the report submitted in House Document, number one hundred and nineteen,

Fifty-sixth Congress, Second Session, by providing channels thirty-five feet deep, . . . six hundred thousand dollars." That is to say, at the very threshold of the inquiry we find that the Congress which had forbidden a longer day's work than eight hours upon "the public works of the United States" had, upon undertaking this very work, deliberately called it a "public work." The cogency of the argument arising from the use of the same words in the eight-hour law, as in the appropriation law, cannot be met by the suggestion that it is easy to read the words in the eight-hour law in a narrower sense than they were used in the appropriation law. The question here is not how the words may be interpreted, but how they ought to be interpreted. There is no necessity to explore the possibilities of escape from the intention which Congress has made sufficiently plain.

In the Digest of Appropriations, made and published under the direction of Congress, these constructions are constantly denominated as "works," and of course they are "public." After the channel is completed, it is buoyed and lighted by the Government, and frequently defended by land fortifications constructed for that purpose. Sometimes breakwaters or jetties are constructed for the purpose of preserving it from impairment. The General Appropriation Act of September 19, 1890, 26 Stat. 426, contains some provisions of permanent law, which are material here. It begins by appropriating "for the construction, completion, repair and preservation of the public works hereinafter named." Then follow many specific appropriations for the improvement of rivers and harbors. Section 3717 of the Revised Statutes was as follows: "Whenever the Secretary of War invites proposals for any *works*, or for any material or labor for any *works*, there shall be separate proposals and separate contracts for each *work*, and also for each class of material or labor for each work." Section 2 of this act provided that that section of the Revised Statutes should not be construed to prohibit "the cumulation of two or more *works* of river and harbor improvements in

the same proposal and contract, where such *works* are situated in the same region and of the same kind or character." Of course the works here referred to are public works. Section 6 prohibits the deposit of material in harbors, navigable rivers or waters of the United States. Section 7, as amended by section 3 of the Act of July 13, 1892, 27 Stat. 88, 110, makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition or capacity of any port, roadstead, haven, harbor, harbor of refuge, or inclosure within the limits of any breakwater or of the channel of any navigable water of the United States, unless approved and authorized by the Secretary of War." The Act of March 3, 1899, 30 Stat. 1151, makes additional safeguard against the obstruction of navigable channels. Thus Congress, which has created these artificial channels keeps them under the constant repair, supervision, control and protection of the Government. When the work is done the Government, through the Navy Department and the Coast and Geodetic Survey, makes, publishes and issues charts which show their length, depth and width in the minutest detail, and the buoys and lights which enable the mariner to use them with safety. He, like Congress, enters upon the channels regarding them as completed wholes, as having a permanent existence, and, if he strays beyond their limits, he will quickly discover that they have a tangible form and structural unity. Doubtless they are subject to alteration by the action of the elements, but so is a building, and, given the constant repair and care which all structures need in order to prevent their disintegration, they are as permanent as the Capitol building itself. Quotations from acts of Congress might be multipled indefinitely showing that with respect to channels Congress had appropriated for them as "works" and for their repair and maintenance as "works;" but if the acts already referred to will not show that Congress regarded such waterways as public works, no number of others will do it. I suppose it would be conceded that breakwaters or jetties were public works. Is it to be supposed that Congress

intended that men who work on them should work only eight hours a day, while those who work near by on the channel itself should be exempted from this restriction? I conclude, therefore, that the labor performed was upon "the public works of the United States."

The eight-hour day is prescribed by the statute, only for laborers and mechanics. These words of description have never been supposed to include and would not include all those who do work of any kind. Although the extent of these words is somewhat vague, nevertheless they were used in a technical sense to describe classes of employés. The second question is whether the men named in the information were laborers or mechancis.

Seamen, whether employed in the Navy or other marine service of the United States or by contractors with the United States, are not laborers or mechanics. They, while laboring as seamen, could no more be brought within the limits of an eight-hour day than a physician, a lawyer, or a clergyman. They have always been regarded with special favor by all governments, and a series of laws specially applicable to them control and affect their conditions of labor. The men employed on the seagoing tug, from the master down, were seamen, and their work was the work of seamen, and the conviction with respect to them was, I agree, erroneous. Those who are employed upon the dredges and scows were not, in respect of the work they were actually doing, in any proper sense, seamen. The master and engineer of the dredge were not licensed, and the men employed upon it seemed not to have entered into any contract of shipment. They were employed usually from those who had served in the merchant marine. They had doubtless acquired the skill and aptitude which especially fitted them for work upon the dredges, which required some handling of lines and some other minor things in which sailors become expert. But because a man has acquired in one occupation skill which fits him for another it does not follow that, when he passes from one occupation to the other, the work

which he does in the new employment entitles him rightfully to be called by the old name. The sailor who is appointed the keeper of a lighthouse may have received his appointment because he was once a sailor, but nevertheless when he enters into the new service he is a lighthouse keeper and not a sailor. The occupation of dredging is not the only one for which life on the sea educates a man. There is a constant demand, for instance, for those who have an honorable discharge from the Navy for employment in civil life. The qualities of obedience, of daring, of fidelity, of the capacity for quick adaptation of insufficient means to the end which may be desired, all the result of training upon the sea, are qualities which are needed in many stations of civil life, but when men have reached those stations by reason of qualities developed in them while seamen they are no longer sailors. The work of the dredge-men and scowmen may be described in a sentence. They were digging a channel and emptying the material excavated in the sea. All those who were engaged in the work may fairly be described as either laborers or mechanics. They had nothing whatever to do with navigation. Neither the dredges nor the scows had steering gear, sails or other methods of self-propulsion. They were towed to the place where the work was to be done and there left to do it.

It does not seem to be important that for some purposes the scows and dredges were vessels, or those employed upon them for some purposes are deemed seamen. The question here is what were the men when they were engaged in the work of excavation? Were the men at that time employed as seamen, doing the work of seamen, or as laborers and mechanics, doing the work of laborers and mechanics? I think they then were laborers or mechanics, and employed as such, and that their occupation is determined, not by what they have done in the past, or by what their employers chose to call them, but by what they were doing when the Government invoked the law for their benefit. If they were then doing the work of laborers and mechanics, whatever they may have done in the past,

which constitutes a motive for their employment, or by whatever name they were employed, they were, or rather their labor was, within the restrictions as to hours prescribed by the law. Nor was their work in dredging incident to their employment on the dredges, but quite the reverse. They never would have been employed at all except for dredging. They never would have set foot on the dredge save to use it as a platform on which to do the work of laborers and mechanics. It should not be forgotten that the object of this statute, in which is embodied an expression of a great public policy, is to regulate labor of the kind named, and the men concerned are in or out of its prohibitions solely by reason of the kind of labor they perform. How can it be material here whether the dredge is or is not a vessel within the admiralty jurisdiction or that in the construction of two specifically named statutes all those upon it are deemed to be seaman? There is no artificial statutory construction prescribed for this act, and what the men on it are is left, under this act, to be determined according to the truth and fact, and the test to be applied is the nature of the labor they actually perform. They were employed to do the work of laborers and mechanics, in the main they actually did that work, and whatever they did which was of the nature of seamen's work was a mere incident to the fact that they labored upon a floating platform instead of upon the dry land.

It is conceded in the opinion of the court that the statute admits of an interpretation which brings these cases within it. May not more be said? Are not these cases fairly within the plain words of the act? If this be so, then the rule of strict interpretation, applicable to penal laws, a rule which has lost all of its ancient rigor, if indeed it is now more than a lifeless form (*United States* v. *Lacher,* 134 U. S. 624, 628), cannot be used to take them out. When the intention of the legislature is reasonably clear, the courts have no duty except to carry it out. The rule for the construction of penal statutes is satisfied if the words are not enlarged beyond their natural mean-

ing, and it does not require that they shall be restricted to less than that.

The impossibility or difficulty of applying this law to the operations of dredging, which upon the evidence, I think, amounts to no more than that it would result in an inconvenience, which the defendants may readily avoid by refusing to contract with the Government, is a consideration fit to be addressed to Congress rather than to this court.

I am authorized to say that MR. JUSTICE HARLAN and MR. JUSTICE DAY concur in this dissent.