**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Louis W. NATHAN, Gaetano Alviti,
Frank C. Tornabene, Patrick J. Knight
and Joseph A. Giralamo, Defendants-
Appellants.**

**Nos. 11665, 11666.**

United States Court of Appeals
Seventh Circuit.

Nov. 7, 1956.

Rehearing Denied Jan. 3, 1957.

402

Richard E. Gorman, Daniel P. Ward, Chicago, Ill., for appellants.

Robert Tieken, U. S. Atty., Mitchell S. Rieger, Asst. U. S. Atty., Chicago, Ill., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., of counsel, for appellee.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

MAJOR, Circuit Judge.

Defendants named in the caption, and others, were charged in a single count indictment with a violation of Sec. 241, Title 18 U.S.C., that is to say, of the crime of wilfully and knowingly conspiring to injure and oppress citizens of the United States, legal and qualified voters of the 7th Precinct of the 1st Ward in the City of Chicago, in the free exercise and enjoyment of certain rights and privileges secured to them by the Constitution of the United States, particularly the right of suffrage, that is, the right to cast a vote for legally qualified persons for the offices of Representative in Congress of the United States from the First Illinois Congressional District, and for Senator in the Congress of the United States from the State of Illinois, and to have such votes honestly counted, as cast, and recorded and certified at their full value in a general election held on November 2, 1954.

Defendants were found guilty by verdict of a jury, and from a judgment entered thereon separate appeals, consolidated in this court, have been taken. Other defendants named in the indictment, Anthony Salvatori, Morton Steinberg, James Gabler and Louis Tornabene, were acquitted by the jury. Another named defendant, Eugene Jerome Laurie, entered a plea of guilty during the course of the trial.

The contested issues as stated and argued by the defendants are: (1) Did the government prove beyond reasonable doubt that the defendants had the intention of injuring and oppressing United States citizens in Federally secured rights? (2) Did the court err in admitting certain evidence against the defendants, such as testimony concerning statements by alleged co-conspirators after the termination of the alleged conspiracy? (3) Was the evidence presented sufficient to prove the defendants conspired as charged? and (4) Did the court err in instructing the jury and in failing to instruct the jury as requested?

In the view which we take of the case and for the reasons subsequently stat-

ed, we think it unnecessary to make a detailed recital of the proof upon which the government relies. A general election took place on November 2, 1954, and the rear portion of the lobby of the New Loyal Hotel at 656 South State Street in Chicago was used as the polling place for the 7th Precinct of the 1st Ward. Five men served as Judges and Clerks in said Precinct and election, as follows: Guy Alvin, as Clerk, who has never been apprehended; Eugene Jerome Laurie, as Judge, under the alias of Tony Genero, who pleaded guilty as charged during the course of the trial; Frank Cleo Tornabene, as Judge, under the alias of Joe Greco; Patrick Joseph Knight, as Clerk, under the alias of Joe Allen, and Joseph Anthony Giralamo, as Judge, under the alias of Chris (Chis) Maner. Thus, of the defendants now before this court, Tornabene, Knight and Giralamo served as election officials. Defendant Nathan, the owner and operator of a club located at 606 South Wabash Avenue in Chicago, was a party precinct captain of the 7th Precinct of the 1st Ward in the City of Chicago, and had been for approximately 25 years. Defendant Alviti was manager of the club owned by Nathan, where he had been employed for some 18 years. His duties on the day in question were to assist the precinct captain. The election was conducted under the jurisdiction of the Board of Election Commissioners of Cook County. All the Judges and Clerks applied for appointment under alias names, were appointed and served under such names and received checks from the County Comptroller for services rendered as election officials in said Precinct, all made payable to said alias names.

The election returns disclosed that 416 ballots were cast and counted in that general election in said Precinct, of which the Democratic candidate for United States Senator from Illinois received 378 votes, and the Republican candidate for the same office, 36 votes, and of which the Democratic candidate for Representative in Congress from the First Illinois Congressional District re-ceived 377 votes, and the Republican candidate for the same office, 38 votes. Four witnesses, registered and qualified voters in said Precinct, testified that they had voted the straight Republican ticket in said Precinct and election.

■ Of the votes thus cast no fewer than 71 were false and fictitious. We do not understand that defendants dispute that such false and fictitious ballots were cast and counted; at any rate, the government's proof on that score is abundant. No purpose could be served, therefore, in relating the manner and means employed to produce that result. In the main they represent votes cast in the names of registered voters who for one reason or another did not participate in the election. Ballots were cast in the names of such registered voters by persons who falsely represented themselves to be the registered voters. In some instances two or three ballots were cast in the name of a single non-participating registered voter. A few ballots were cast in names of persons not registered as voters. Some ballots were cast in the false and fictitious names under which certain of the Judges and Clerks served as election officials.

■ We have said we find it unnecessary to make a detailed statement of the government's proof. This is particularly so as it relates to the charge of conspiracy. A study of the record leads us to the firm conviction that the proof, without room for controversy, shows a conspiracy, the object and purpose of which was to cast and cause to be cast false and fictitious ballots. It may be true that the proof connecting some of the defendants with the conspiracy is rather weak but, even so, it was sufficient to take the case to the jury on that issue. Furthermore, the proof is conclusive that the objective of the conspiracy was accomplished and that as a result there was a pollution of the ballot box in this Precinct.

Of the numerous questions argued here, the most important arises from defendants' contention that it was incumbent upon the government to prove that

the defendants, pursuant to the conspiracy alleged, had the specific intent of injuring or oppressing a citizen in the enjoyment of a Federally secured right. A number of instructions offered on this theory were rejected by the trial court. Typical of such refused instructions is one which reads as follows:

"Unless you find, beyond a reasonable doubt, that the defendants conspired, combined, confederated and agreed together with the specific and willful intent to injure and oppress a citizen of the United States in the exercise of a right guaranteed or secured by the Constitution or laws of the United States, and did so knowingly, it is your duty to acquit the defendants, or such defendant or defendants who did not knowingly, and with such specific and willful intent so conspire, combine, confederate and agree."

The theory embodied in the court's given instructions was that a general intent was sufficient. The government here defends that theory. In its brief it states:

"The Government contends that the intent needed to support a conviction under Section 241 is the same intent which is required, as a general rule, by most criminal statutes and which was described by Mr. Justice Holmes in Ellis v. United States, 1906, 206 U.S. 246, at [page] 257 [27 S.Ct. 600, at page 602, 51 L.Ed. 1047]: 'If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent.'"

The government also relies upon United States v. Lightfoot, 7 Cir., 228 F.2d 861, 866, a recent decision of this court, wherein it is stated:

"The law assumes every man to intend the natural consequences which one standing in his circumstances and possessing his knowledge would reasonably expect to result from his acts."

The contention under discussion, of course, assumes that a conspiracy was shown, the purpose of which was to cast and cause to be cast false and fictitious ballots. We think it can be plausibly argued, as defendants do, that there was no intention or purpose on the part of defendants to injure and oppress citizens of the Precinct in the enjoyment of their constitutional rights. Certainly it is just as reasonable and perhaps more so to believe that their purpose and objective was something different. In fact, we think it more likely, as defendants point out, that the engagement by the defendants in their nefarious conduct had as its objective the making of a good showing in the Precinct for the political party in which they were interested so as to win the acclaim of those higher up in the political hierarchy, with such reward and preferment as might be reasonably expected to flow therefrom.

This contention that the burden was upon the government to prove a specific intent or, at any rate, that defendants were entitled to have the issue submitted to the jury under proper instructions, is not without merit and finds some support in the cases. Buchanan v. United States, 8 Cir., 233 F. 257; Janes v. United States, 8 Cir., 6 F.2d 545; McDonald v. United States, 8 Cir., 9 F.2d 506; Britton v. United States, 7 Cir., 60 F.2d 772; United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588; Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561.

However, the support which these and other cases afford defendants' contention has, in our judgment, been dissipated by later decisions of the Supreme Court. See United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341; Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, and United States v. Williams, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758.

Defendants in the trial court cited the Screws and Williams cases in support of their proffered instructions on the issue of specific intent. The trial court evidently thought their reliance upon these cases was misplaced. Now, in this court, the government relies upon these same cases in support of its position.

The apparent confusion in these decisions of the Supreme Court may be attributable, we think, to the sharp division which existed among members of the court and a failure to give proper recognition to the distinction which the court has made between violations of Sec. 241 and Sec. 242.

Sec. 241 (formerly Sec. 19 of the Criminal Code, which originated as Sec. 6 of the Act of May 31, 1870), charged to have been violated in the instant case, is a conspiracy statute and provides:

"If two or more persons conspire to injure, oppress * * * any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States * * *" (then follows the prescribed penalty).

Sec. 242 (formerly Sec. 20 of the Criminal Code, which originated as Sec. 2 of the Civil Rights Act of 1866) provides:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State * * * to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States * * *" (then follows the prescribed penalty.)

Any discussion of the Supreme Court decisions involving these two sections of the Civil Rights Act may well commence with the Classic case, 313 U.S. 299, 61 S.Ct. 1031, 1035, not only because of what was said in that case but because of the appraisement given to it by the Supreme Court in subsequent decisions. There, the question for decision was whether the right of qualified voters to vote in the Louisiana primary and to have their ballots counted was a right "secured by the Constitution" within the meaning of Sec. 19 (now 241) and Sec. 20 (now 242) of the Criminal Code, and whether the acts of the defendants as alleged in the indictment violated those sections. The court answered the questions in the affirmative, with three Justices dissenting. There, the defendants as election officials were charged with altering ballots, counting them for candidates other than for whom they were cast, and making false certification of the number of votes cast for the different candidates. The court, 313 U.S. at page 315, 61 S.Ct. at page 1037, cites numerous decisions in support of its holding that the right of qualified voters to cast their ballots and have them counted at Congressional elections is a right secured by the Constitution. The court held that Sec. 20, as well as Sec. 19, was applicable on the premise that both sections protected rights which stemmed directly from the Constitution. At the same time, the court refused to discuss the application of Sec. 20 to deprivation of rights guaranteed by the Fourteenth Amendment because the question had not been raised and discussed in the court below.

The Screws case, 325 U.S. 91, 65 S.Ct. 1031, 1035, in which defendants here profess, mistakenly we think, to find support for their specific intent contention, is another of these civil rights cases in which the court was sharply divided. Four of the members embraced what is designated as the majority opinion, one member concurred in the result but upon reasoning different from that utilized by the so-called majority, and four members dissented. In this case the court reversed a judgment, with directions for a new trial, wherein defendants, local law-enforcement officers, were charged with arresting a Negro citizen for a State offense and wrongfully beating him to death. The prosecution was based upon a violation of Sec. 20 (now 242) concerning a right which did not stem directly from the Federal Constitu-

tion but which was a deprivation of due process as guaranteed by the Fourteenth Amendment. Sec. 20 was subjected to attack as being unconstitutional on the grounds that it provided no ascertainable standard of guilt when applied to Fourteenth Amendment rights. The reasoning on this score was that due process rights are of such a variable nature that there is no way of knowing in advance which rights are included within its broad scope. The court, in order to preserve the constitutionality of Sec. 242, held that the word "willful" included in that section (not included in Sec. 241) should be construed as applying to an act committed with the specific intent to deprive a citizen of a due process right. This construction, so the court held, avoided "those consequences to the accused which may otherwise render a vague or indefinite statute invalid." The court stated, 325 U.S. at page 105, 65 S. Ct. at page 1037:

" * * * the only other alternative, if we are to avoid grave constitutional questions, is to construe it as applicable only to those acts which are clearly marked by the specific provisions of the Constitution as deprivations of constitutional rights, privileges, or immunities, and which are knowingly done within the rule of Ellis v. United States, supra. [206 U.S. 246, 27 S.Ct. 600.] But as we have said, that course would mean that all protection for violations of due process of law would drop out of the Act."

The judgment in Screws was thus reversed because of the failure to instruct the jury that a specific intent was required. It therefore appears plain that the reasoning of the court was limited expressly to due process rights predicated on the Fourteenth Amendment and that it has no application to rights specifically guaranteed by the Constitution, such as those in the instant case. Mr. Justice Rutledge in a concurring opinion reasoned that Secs. 19 and 20 are twin sections in all respects that concern any question of vagueness, that they each guard the same basic rights and that they must stand or fall together. Unfortunately, however, for the defendants his reasoning, logical as it may appear, was not that of the court.

Another important observation relative to the opinion of the majority in the Screws case is the appraisement which it made of its decision in the Classic case. Referring to this latter case, the majority stated, 325 U.S. at page 106, 65 S.Ct. at page 1037:

"The indictment was sufficient since it charged a willful failure and refusal of the defendant election officials to count the votes cast, by their alteration of the ballots and by their false certification of the number of votes cast for the respective candidates. 313 U.S. at pages 308, 309, 61 S.Ct. at pages 1034, 1035, 85 L.Ed. 1368. The right so to vote is guaranteed by Art. I, § 2 and § 4 of the Constitution. Such a charge is adequate since he who alters ballots or without legal justification destroys them would be acting willfully in the sense in which § 20 uses the term. The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution. When they so act they at least act in reckless disregard of constitutional prohibitions or guarantees."

United States v. Williams, 341 U.S. 70, 71 S.Ct. 581, is another case where the court was sharply divided. Four members embraced what is known as the majority opinion, one member concurred in the result on an entirely different basis and four members dissented. In this case the majority affirmed the Court of Appeals for the Fifth Circuit, which had reversed a conviction on a conspiracy indictment based on Sec. 241. It was there charged that a citizen was injured in rights and privileges secured and protected by the Fourteenth Amendment. The majority held that such rights were

protected by Sec. 242 but not by Sec. 241. We find nothing in the majority opinion of any benefit to either of the parties in the instant case on the issue under discussion. True, the dissenting opinion approves the concurring opinion of Mr. Justice Rutledge in the Screws case, that Secs. 241 and 242 are companion sections, with no substantial difference in the basic rights protected, and that they were both in the same category on the matter of vagueness. The dissenting opinion, 341 U.S. at page 94, 71 S.Ct. at page 594, sets forth the instructions which were given by the trial court in that case, which followed the rule in the Screws case in order to avoid any claim of unconstitutionality of Sec. 19 on the ground of vagueness. The reasoning appears to be that any uncertainty arising from the fact that Fourteenth Amendment rights were alleged in an indictment based upon Sec. 241 becomes immaterial in view of the fact that the burden was imposed upon the government by the instructions to the jury to prove a specific intent. There is no comfort for defendants in the instant case, however, in this dissenting opinion. Aside from the fact that it does not represent the opinion of the court, it is plain that the dissenting opinion stands only for the requirement of specific intent in a case involving due process rights. In fact, the cleavage between the two segments of the court was due to the reasoning of the majority that a violation of due process rights could be prosecuted only under Sec. 242, while the dissenting members reasoned they could be prosecuted under either section, providing, as we understand, that a jury was required to find a specific intent on the part of the defendant to violate such rights.

Another case worthy of mention is United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101. In that case, as here, defendants were charged with acts which amounted to a pollution of the ballot box. The indictment in that case was predicated upon Sec. 19 of the Criminal Code (now 241) and in all material respects was the same as the indictment in the instant case. The Supreme Court reversed a District Court which had held the indictment defective as failing to state a crime against the United States. The Court in its discussion made the following pertinent observation, 322 U.S. at page 389, 64 S.Ct. at page 1103:

> "For election officers knowingly to prepare false ballots, place them in the box, and return them, is certainly to prevent an honest count by the return board of the votes lawfully cast. The mathematical result may not be the same as would ensue throwing out or frustrating the count of votes lawfully cast. But the action pursuant to the conspiracy here charged constitutes the rendering of a return which, to some extent, falsifies the count of votes legally cast."

It is our view and we so hold that the court properly rejected the contention that the burden was upon the government to prove that the defendants had the specific intent to injure and oppress a citizen in a right secured by the Constitution. The cases, so we think, require that result. A contrary holding would cast Sec. 241 to the ash heap. Specific intent could be had only by those with knowledge of the rights conferred upon the citizen by the Constitution. It must be remembered in the instant situation that injury to the citizens followed inevitably from the nefarious conduct of the defendants. Those who participated in such conduct assumed all the hazards incident thereto, including injury to the citizen which was certain to flow therefrom. And it is immaterial that the defendants were without knowledge of the constitutional rights of citizens. When they acted in concert to pollute the ballot box they acted in reckless disregard of such rights and must be held to the consequences. (See quotation from Screws case, supra.)

Defendants also rely upon a number of other errors alleged to have been committed by the court in its charge to the jury. The court, in referring to

a certain government witness, stated that he "testified for the purpose of showing bad character, for it is not the man that he is but the name that he has which has been put in issue." Defendants argue that they were seriously prejudiced by the court's characterization of "bad character" when it should have been "bad reputation." We think this point is of little or no consequence. Knode v. Williamson, 17 Wall. 586, 84 U.S. 586, 588, 21 L.Ed. 670. The court, after explaining to the jury the difference between direct and circumstantial evidence and that either or both could be relied upon for a conviction providing the guilt of the defendants was shown beyond a reasonable doubt, stated, "generally, direct proof of a criminal conspiracy is not available and it will be disclosed only by a development and collocation of circumstances." The phrase, "development and collocation of circumstances," has been employed in court opinions. United States v. Manton, 2 Cir., 107 F.2d 834, 839, and Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. It does not follow, however, that it is a proper phrase to be employed in an instruction. But whether so or not, it is not discernible how it could have been prejudicial.

■■ Defendants complain of an instruction the substance of which is stated in their brief as follows, " * * * if the defendants or any one of them or any two of them conspired to cast false votes for a federal candidate, the jury must find that the defendants conspired to injure citizens in the enjoyment of their civil rights." Defendants at this point reiterate their argument re "specific intent," which we have previously discussed and rejected. Obviously, one person cannot engage in a conspiracy and the words, "or any one of them," should have been omitted. Otherwise, in view of our discussion of the "specific intent" issue, we think the instruction was quite favorable to defendants. Defendants complain of a portion of the court's charge on the element of intent. After discussing that element, and particular-

ly the manner in which it could be proven, in language not complained of, the court stated:

"You cannot look into a person's mind and see what his intentions are or were, but a careful and intelligent consideration of the facts and circumstances shown by the evidence in any case enables us to infer with a reasonable degree of accuracy what another's intentions were in doing or not doing certain things."

It is the phrase, "with a reasonable degree of accuracy," of which complaint is made and which it is argued relieved the government of proving intent beyond a reasonable doubt. We think the phrase complained of was erroneous, at any rate its use was unfortunate and under some circumstances might be prejudicial. However, the jury was instructed time and again that every essential element of the charge must be proven beyond a reasonable doubt before conviction could be had. More than that, we have rejected the theory that the burden was upon the government to show that the defendants had a "specific intent" to oppress a citizen in the exercise of a constitutional right. The intent which the court was discussing in the instruction under consideration related to an intent on the part of defendants to cast and cause to be cast false and fictitious ballots. On that score, as we have indicated, the proof was of such a certain and convincing nature that a jury could not have found other than that the defendants had such an intent. When the instructions are considered as a whole, and particularly under the setting of the case as it pertains to the issue of intent, we have no reason to believe that the phrase complained of was prejudicial.

We have examined other criticism directed at the instructions, which we find without merit. In fact, a reading of the entire charge as given to the jury leads us to the belief that it was fair and as favorable to the defendants as they had a right to expect.

■ The indictment alleged, of course, that the defendants pursuant to the alleged conspiracy injured and oppressed citizens in the exercise of their constitutional rights. In support of this allegation the government introduced four witnesses who testified that they voted in the election for the candidates of a certain party, including those for Federal offices. The government, however, failed to prove that such voters were citizens, which failure, so the defendants argue, constitutes a fatal defect in the proof. Each of such witnesses testified that he was born in the United States, voted in the Precinct in question on November 2, 1954, and that he had been a resident of said neighborhood for ten years or more. The government contends that this proof raises a strong presumption of citizenship and that no more is required. The cases support the government's position. Baker v. Keck, D.C., 13 F.Supp. 486; Ex Parte Delaney, D.C., 72 F.Supp. 312, 324; United States ex rel. Leong v. O'Rourke, D.C., 125 F.Supp. 769, and Hoffman v. United States, 10 Cir., 68 F.2d 101, 103. In fact, the latter case involved a civil rights prosecution under a predecessor statute to what is now 241. There, as here, defendants asserted error because of a failure to prove citizenship. In denying the contention the court stated:

"A person is presumed to be a citizen of the country in which he resides until the contrary is shown. [Citing cases.] * * * Furthermore, a presumption of citizenship arises from the testimony of Sanchez that he voted in New Mexico and Colorado. [Citing case.]"

We hold the proof on this point was sufficient.

■ Defendants contend that the court erred in permitting the testimony of an expert witness offered by the government on the ground that there was no proper showing of qualification; also, that the court permitted the admission of certain evidence prejudicial to defendants. We have examined the facts upon which this criticism is based and are not impressed that any serious injury was done the defendants. In any event, the court had a discretion in its rulings on these matters and there is no basis for holding that its discretion was abused.

In our view, the record is free from prejudicial error; in fact, we think defendants were accorded a fair trial and that a different result could hardly have been expected.

The judgment is

Affirmed.