# CIRCUIT COURT OF BALTIMORE CITY.

Filed November 13, 1928.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION NO. 37, JAMES V. ANDERSON AND WILLIAM HOWARD ERSKINE, OFFICERS AND MEMBERS, AND MICHAEL CHAPMAN, A MEMBER OF SAID LOCAL UNION NO. 37, AND INDIVIDUALLY AS RESIDENTS, CITIZENS AND TAXPAYERS OF THE CITY OF BALTIMORE, PLAINTIFFS,

VS.

MILTON J. RUARK, ENGINEER OF SEWERS OF THE CITY OF BALTIMORE, THE MAYOR AND CITY COUNCIL OF BALTIMORE, A MUNICIPAL CORPORATION, THE RYAN CONSTRUCTION COMPANY. A BODY CORPORATE, PIO MAROCCA, WILLIAM H. THOMPSON, FRANK ANGELLOZZI, N. MARTELL, J O H N MATRICCIANI, PETER D. ADAMS AND ROSSE MARINO, TRADING AS ADAMS & MARINO, AND DOMINICK CATALANO AND FRANK PECORA, TRADING AS CATALANO & PECORA, DEFENDANTS.

*Isaac Lobe Straus* solicitor for complainants.

*Harley & Wheltle & Webster. George Ross Veazey* and *Edwin W. Wells* solicitors for defendant contractors.

*Simon E. Sobeloff*, Deputy City Solicitor, for Mayor and City Council of Baltimore.

**O'DUNNE, J.—**

This is a bill to restrain by injunction, the city and contractors engaged by it, in the construction of its municipal works (public sewers), from employing and permitting to be employed in such public works, laborers who labor thereon more than eight hours a day, because of the legislative prohibition contained in the Act of 1910, Chapter 94. It is contended:

(1) That the Act is unconstitutional. (In the first contention, the City does not join).

(2) That equity is without jurisdiction solely because Sec. 4 of said Act provided a fine up to $50 for its violation by the city or others: that therefore there is a remedy at law and equity does not enjoin commission of crime.

As to proposition No. 1, I hold that the Act is not unconstitutional, for reasons given hereafter.

Second, that while it is true, generally speaking, when academically and technically considered, that ordinarily, equity should not be invoked as a substitute for criminal procedure, on the theory that in such case an adequate remedy is provided at law, however, the mere insertion of a fine in a statute passed to effectuate a large public purpose, indicative of a definitely declared public policy, should not in all cases be permitted, on narrow technical grounds, to thwart the legislative mandate to a designated municipality, acting as a State agency, in the discharge of functions of State sovereignty.

The reserve power of equitable tribunals is broad enough to determine when a proper case arises for the exercise of that reserve power of government vested in such tribunals of the people functioning in the interest of the general public. This is such a case. The injunction should issue and demurrer should be overruled.

My more detailed reasons are as follows:

As to the constitutionality of the Act of 1910, Chap. 94. *The Kansas 8-Hour Law*, of which ours is perhaps almost a verbatim copy was upheld in Atkins vs. Kansas, 191 U. S. 207:

"It is equally true—indeed the public interests imperatively demand—that Legislative enactments should be recognized and enforced by Courts as embodying the will of the people, unless they are plainly and palpably beyond all question and in violation of fundamental law of the constitution.

"It cannot be affirmed of the Statute of Kansas that it is plainly inconsistent with that instrument; indeed its *constitutionality is beyond all question*" (Italics mine), pp. 223-4.

But it is contended that Atkins vs. Kansas has been overruled by the later case in 1926, of Connally vs. Gen'l Construction Co., 269 U. S. 385:

This case involved the construction of Oklahoma Act strikingly like ours in terms. It provided for eight-hour day for all *employed by State* (and by contractors working for State), but the question involved was the *standard* for measuring the criminal provision, or that part of it in question, which read:

"That not less than the current rate of per diem wages in the locality where the work is performed shall be paid the laborers, &c., so employed by the States, &c., and provided criminal penalties for infraction."

Bill to restrain enforcement of this law.

Facts arose as to wages on bridge near town of Cleveland, Oklahoma.

(1) Held "Current Rate" is an uncertain standard. Does it mean current minimum or current maximum?

The Court goes on:

(2) As to locality? "Who can say

with any degree of accuracy what areas constitute the *locality* where a given piece of work is being done. Two men moving in any direction from the place of operation would not be at all likely to agree upon the point where they had passed the boundary which separates the locality of that work from the next locality" (page 394).

On page 391:

"A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to the application violates the first essential of due process of law" (citing cases).

Here, it was held void, but the *eight-hour* provision was not involved in the case.

Three answers may be made to the contention that the Connally case, in 269 U. S., overrules the Atkins case, in 191 U. S.

(1) The United States Supreme Court is not given to overruling cases by implication, without any reference to the solemn pronouncement of that Court, as previously made.

(2) The eight-hour feature of the law was the provision under consideration in the Atkins case, in 191 U. S., whereas an entirely different provision in the Oklahoma statute was the subject of attack in the Connally case, in 269 U. S. The Court held that attempt to enforce criminal penalties, based on so vague and uncertain standard as *"current rate of wages"* in the *"locality"* where the work was performed, and that locality being *Oklahoma*, was *too vague* for ascertainment. Oklahoma is a vast territory. It is nearly seven times larger than all of Maryland—as large as Maryland, Delaware, Virginia and the District of Columbia, with Vermont thrown in. "Locality" under such conditions would be impossible of ascertainment.

Whereas the Maryland statute in question (Act 1910, Chap. 94), is applicable only to Baltimore City. and the current rate of wages in that limited and definitely fixed locality of the city limits, is easily susceptible of accurate ascertainment.

(3) The Act of 1910, Chap. 94, has gone to our Court of Appeals in two

cases: Sweeten vs. State, 122 Md. 634 (decided in 1912), and the case of Elkan vs. State, 122 Md. 642, argued same day, with opinion filed in the Sweeten case, but specifically adopted in the Elkan case, and the constitutionality of this Act was not only upheld by *our* Court of Appeals, but the Elkan case was appealed to the United States Supreme Court, and affirmed in 1915, in 269 U. S. 643, on authority of the Atkins case, in 191 U. S.

In Lockner vs. N. Y., 198 U. S., at 55, the Atkins vs. Kansas case, in 191 U. S., was again affirmed. It seems to me, therefore, it cannot be contended that the Connally case, in 269 U. S., overrules the Atkins case, in 191 U. S.

In Heim vs. McCall, 239 U. S., at 192 and 193, it is said:

"It belongs to the State, as guardian of its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities."

See Ellis vs. U. S., 206 U. S. 246.

Eight hours a day (Act 1910. Chap. 94), is the limitation of time set by the Legislature for work performed in Baltimore municipal public works. It is the *definitely expressed mandate of the State Legislature.*

That this mandate has been utterly disregarded by the municipality would seem quite apparent from the indictments in the Sweeten case, in 122 Md., and the Elkan case, immediately following in the same volume. The conviction was there affirmed by our Court of Appeals. The constitutionality of the Act in turn was again affirmed by the United States Supreme Court on appeal in that very case.

That the practice of continued violation by our municipality of this expressed will of the Legislature is also apparent from the demurrer to the bill, admitting for purposes of demurrer, the allegation of the bill. From the oral argument, I understand the fact will not be denied as a fact in any answer.

Therefore, it would seem the indictments of some 30 counts referred to in the Sweeten case and in the Elkan case, in 122 Md., have not deterred the municipality from openly and continuously disregarding the Legislature's mandate. We may not be concerned in this

proceeding with the effect of *example* in official disregard of law by municipal corporation. This may be a moral issue. We limit our consideration of the question to the economic effect on the taxpayers who are interested in the most efficient expenditure of the public monies. They justly have a jealous regard for any loss of taxpayers' money, occasioned by deterioration due to defective construction by tired and careless labor, overtaxed by long hours, in the performance of public improvements both under ground and on the surface.

Is this loss to taxpayers unappreciable in amount? An examination of the loans submitted to, and approved by, the people of Baltimore since 1910 (when the eight-hour restriction as to physical endurance for those laboring in construction of public municipal works in Baltimore was passed), discloses that, tabulated roughly, they amount to nearly $200,000,000, of which over $40,000,000 is for sewerage construction, a form of work especially affecting public health. In these figures I include $10,000,000 sewer loan *available* in 1910, though passed before that date.

In the November 6, 1928, election there were $16,000,000 more loans for public improvement in Baltimore (a portion of which is for replacement of the 1920 loan to better the rate of interest therein authorized, and to that extent may be considered as included in the general figures.)

If the municipality is continuing the expenditure of the taxpayers' money in any amount nearly **approximating** $200,000,000 appropriated since 1910—and has millions and millions now available, and being used, in municipal public works, and is constructing those works in which the taxpayers are *so vitally* interested, and in which the people of this city are concerned, *without regard to whether they are burdened taxpayers or not*, and doing so with a contemptuous disregard of the clear mandate of the Legislature that such public works shall be done in a certain way, and according to certain *specifications*, has not any taxpayer the right to insist that the specification shall be faithfully complied with, without substitution either of inferior material, or inferior workmanship? If the Legislature believes, and definitely

and mandatorily *expresses* its belief, that the grade and character of labor expended in its public works of *this municipality*, shall not be by persons taxed to greater exertion than eight hours a day on its behalf, has not any taxpayer as much right to demand that his burden of taxes shall not be increased by any *skimping* in the *grade* of labor used, as he would have to ask that the city be enjoined from expenditure of the public money in *inferior materials*, below definite standards clearly enumerated in the specifications? In considering the durability of the construction of public works, certainly the *grade of labor* used is as important an item entering into the *value* of construction, as is the quantum and quality of the materials.

If the Legislature directed the construction of the Light Street bridge, and specified it must be of *concrete*, could not a taxpayer enjoin an attempted construction of it out of wood?

Does his substantial financial interest therein *vanish*, and his rights as a taxpayer go glimmering because in some section, somewhere in the legislative enactment, provision is also made for a fine assessable against anyone who substitutes false material, either in quantity or quality, from those provided for in the definite specifications? And is not labor as much of a material in this sense as any other entering into its construction?

Wherefore, it seems to me the argument that the great reserve power of the equity tribunals of the people are shorn of all their strength and vigor because a minor, unimportant and demonstrated to be wholly *ineffectual*, provision for a fine is found provided for in Section 4 of Chapter 94 of the Act of 1910, is without force. It would put a premium on narrow technicality by which *substance* would be made subservient to *form*. If I may paraphrase a line from the great dramatist, shall we fly heedlessly over the beauties of law, and see nothing but petty technicalities couched in the corner? Such was the reproach of the common law. This very attitude of the early tribunals gave birth to equity. It was born out of a revolt of the broad principles of justice, against the narrow concepts of technical legal minds whose vision converged in a limited horizon, utterly oblivious to the grandeur of

the legal panorama. This stricture, self imposed, by the common law tribunals, caused equity to rise, not "Phoenix like from its ashes," because they still glow with all their ancient vigor, though yet bound up in much of their early and narrow technicality.

In Baltimore vs. Gill, 41 Md. 375, at page 395, our Court said:

"In this State the Courts have always maintained with jealous vigilance the restraints and limitations imposed by law upon the exercise of power by municipal and other corporations; and have not hesitated to exercise their rightful jurisdiction for the purpose of restraining them within the limits of their lawful authority, and of protecting the citizen from the consequences of their unauthorized or illegal acts.

"If the right to maintain such a bill as this be denied, citizens and property holders residing or holding property within the limits of a municipal corporation, would be without adequate remedy to prevent the injury and damage which might result to them from the unauthorized or illegal acts of the municipal government, and its officers and agents."

Much has been said on both sides about the case of Kelly, Piet & Co. vs. Baltimore, 53 Md. 134.

It was held on the facts to be a controversy between rival tradesmen for the printing business of the city. Relief was denied on that ground. The Court rose majestically to the inherent possibilities of its jurisdiction when it said, at page 139:

"In exceptional cases, where great principles, or large public interests are involved, citizens or corporations may sue in behalf of themselves and their fellow-citizens to arrest some projected violation of constitutional law, or abuse of corporate authority."

Pumphrey vs. Baltimore, 47 Md. 145, was a mandamus proceeding by a private citizen to compel the city to take charge of a bridge at Gwynn's Falls according to an Act of the Legislature and mandamus was *granted*. On page 154 the Court said:

"In Baltimore vs. Gill, 31 Md. 375, an injunction was granted against appellants, upon principles somewhat analogous to those which govern the present case."

I infer the mandamus would also have issued in Graham vs. Gaither, 140 Md. 330, except for the very peculiar situation presented by the answer filed, and because of the discretionary alternative vested in the Police Commissioner as to procedure, but more particularly because of the fact that the ball games sought to be prevented by mandamus were at the time of the hearing matters of history, mandamus must be issued as prayed, if it is to issue at all, and it could not, therefore, issue in that case. The game was over!

I do not, therefore, regard this decision as adverse to complainants' contention here. Quite the contrary.

### Supremacy of Declared State Policy as Expressed in Legislative Mandate.

The judicial branch of government is not required to find affirmative evidence satisfactory to its mind, of the soundness, wisdom or experience of a State public policy finding expression in the statutory mandates of the Legislature, nor is it permitted to veto such expression unless plainly repugnant to the fundamental law of the land. Arguments are readily available, however, to support the legislative policy, if support were required.

Reduction of hours of labor must not be viewed solely from the economic effect either on production, or on profits to the producer, or on wages to the employed. These are undoubtedly within the domain of consideration by political economists, but they do not occupy the *entire* field, they form but *one zone*. There are other, and even more important, zones.

The economic zone is briefly surveyed in a report submitted by the Secretary of the National War Labor Board, published July 20th, 1918 (Peabody Library, No. 331, 81 U. 58 N. W. M.), with the conclusion that the volume of production is *increased* by the reduction of hours of labor to eight.

Secretary of Commerce, Redfield, is quoted as follows: "The cry for shorter hours of labor * * * is a normal protest against the *fatigue* that *destroys*."

From the same report, I quote from the last paragraph:

"The way to crime and chaos lies plainly in the exploitation of our men and our women as if they were coal and oil. In our free America there is

to be industrial and social freedom, and out of the foment of unrest there has already begun to come a true sense of human values, a better adjustment of law to those values, a keener conscience as to the treatment of those values, and a conservation that will not stop with saving of water or wood, but will make its greatest and most fruitful task, the conserving of our people themselves" (p. 104).

Again from the same source, page 102:

"While shortening the hours of labor does not decrease output, nor materially increase the cost of production, long hours, on the other hand, reduce efficiency and result in inferior output. Over-fatigue results in spoiled work; and it is generally found that the output in the last hours shows a steady and marked decline."

Former Secretary of War, George W. Alger, says:

"The notion that preparedness is a military thing * * * is a delusion. Sweat shop, child labor, industrial anarchy held in check by martial law, the exploitation of the worker * * * all these and a hundred others, are true problems of preparedness which are today ignored."

The legislative mind of the Federal system has committed the central government to the eight-hour movement. If the Maryland Legislature, somewhat in advance of much of the Federal legislation, adopted this as State policy (at least for the public works of its chief municipality), what right has the judicial branch, irrespective of which school of political economists an individual judge may think the more sound, to ignore its mandates when officially called upon to see that obedience thereto is yielded by its municipal agencies of government?

Is not leisure one of the many requisites for good citizenship? Is not the State dependent on good citizenship? Has it not a right to demand a quantum of leisure for those at least who are engaged in the construction of its public works? Has it not a right to exact that its employees in such work shall not be too exhausted to *use* some of that leisure in a manner that makes for better citizenship? As I pass on the public highways of municipal life, and look at its public works in the

making, and gaze down into the municipal trenches in which the conduits for public sanitation are laid, I am struck with the foreign appearance of large gangs of laborers. Is not a familiarity with the English language and an understanding of the American institutions of importance? It is primarily necessary for *admission* to citizenship, and *essentially* necessary thereafter for *good* citizenship. Today we are solemnly commemorating the signing of the Armistice. Will anyone say the legislative leisure thus created making possible cessation of all business activity and affording opportunity for the contemplation of the glories of liberty (for the preservation of which all forms of government are supposedly ordained), fails to make its profound impression upon the present and prospective citizenship of both State and Nation?

Mr. Charles Sumner Bird, one of the largest paper manufacturers in the world, when discussing the effects of long hours on industrial workers, says:

"They are as dangerous to the welfare of the nation as was slavery of the black race. The men employed for such long hours are taxed beyond their strength, and the physical exhaustion, day after day, week after week, soon results in *lower standards of life.* No time or energy left for development of healthy home life, essential to the welfare of the nation" (Reference to where obtained was lost).

Outside the zone restricted exclusively to economics (measured in money), is the zone of health. Medicine recognized that exertion producing exhaustion causes a poison in the system, and when *acute*, creates a specific poison, or the *"toxin of fatigue."* If fatigue toxin were injected in animals in sufficient quantities, it would cause death. To overcome this toxin, *rest* is requisite. Otherwise we increase the municipal liability for accidents due to careless and indifferent work, and the payment of these judgments comes out of the pockets of the taxpayers. It is no sufficient or complete answer to say that under certain decisions, municipalities, as a form of sovereignty, while engaged in *public* sanitation, are exempt from such civil liability. If so, it is but *an additional* reason why the Legislature may provide safeguards to diminish the likelihood of their occur-

rence, because of its non-liability in some such cases to the injured.

From Bulletin of the Committee of One Hundred on National Health, Washington, D. C., 1909, page 47, I take the following:

"A typical succession of events is, first fatigue, then colds, then tuberculosis and then death. Prevention to be effective, must begin at the beginning."

Is not this a succinct statement of the argument underlying the policy which the Legislature has seen fit to promulgate governing the construction of its public works?

No man has a vested right to be employed in the construction of public works. The Legislature may determine under what conditions, and subject to what restrictions, he may be so employed. One of these is that he shall not be employed more than *eight hours* in the construction of the *public works* in the *municipality of Baltimore*.

In the briefs filed by counsel before the Supreme Court in the case of Bunting vs. Oregon in 1915 will be found a summary of the various arguments for short hours.

A review of judicial decisions dealing with the hours of labor may also be found collected in Bulletin No. 46, N. Y. State Department of Labor, March, 1911.

But, in the language of a deceased Southern Maryland jurist of the Court of Appeals: "It will serve no useful purpose to further multiply authority."

The day after submission of this cause, Mr. Straus, counsel for complainant, furnished me (with copies to adverse counsel) the following most interesting extract:

"In J. E. Thorold Rogers' classic History of English Labor—'Six Centuries of Work and Wages'—referring to the superior quality of workmanship under the Old English Statute of Labourers, during the fifteenth and sixteenth centuries, prescribing eight hours as the working day, it is said at pages 542-543:

" 'Employers were very likely to discover that the labourer's resistance to an excessively long day was not entirely personal, and that *the work might suffer from the workmen's weariness or exhaustion*. Now the *quality of the work* in the old times of which I have written is unquestionable. It stands *to this day* a proof of *how excellent ancient masonry was*. The building from the construction of which I have inferred so much as to work and wages, is still standing as it was left four centuries ago. *I am persuaded that such perfect masonry would have been incompatible with a long hours' day*. You may still see brickwork of the next century, which I venture on asserting no modern work would parallel; and within five minutes' walk of it Roman brickwork, probably sixteen centuries old, which is as solid and substantial as when it was first erected. The artisan who is demanding at this time an eight hours' day in the building trades is simply striving to recover what his ancestor worked by four or five centuries ago. *It is only to be hoped that he will emulate the integrity and thoroughness* of the work which his ancestor performed.' "

The fact remains, however, that in the time of Elizabeth *twelve hours* was prescribed as the working day, of which two and one-half hours were devoted to rest periods, for meals, etc., and it provided a fine for "a penny an hour" on the laborer for being absent from his work.

The publication of this "Six Centuries of Labor" was made by Rogers from the House of Commons in London in 1886, and may be found at the Peabody (No. 331.42 R 727).

A much larger publication is "Life and Labor in London," in five volumes, appearing in present form in 1903, by Charles Booth and a staff of five assisting in his research work. It is handled in a scientific manner which would do credit to any American institute attempting to make a modern *survey* of existing conditions. It treats all trades and all professions. From Chapter VII of Vol. 5, at page 199, I cull this extract:

"The willing and the idle, the overworked and the underworked, jostle in the same crowd, live in the same street and move in the same civic life; all alike in their own ways, exert their measure of usefulness, and all alike beget children. It is thus inevitable that the whole community should suffer from the deterioration of any section; from this there is no escape. In

the social state,* no man or woman, however lonely, stands apart, and later generations, if not we ourselves, will suffer from the effects of every form of present degradation.

"The form of degradation that follows from *excessive hours* takes different shapes. It may even be compatible with regular work, good wages and abundant food, for too long hours tend to create a mechanical and absorbed mind indifferent alike to home and to the wider interests of life. Such degradation is perhaps undetected and is the more subtle because more self absorbed, than the *extreme* forms of the same evil. It may not involve as great economic or physical evils, but its moral effects are hardly less regretable and sinister."

The stress of trial work which leaves no leisure for consideration of "sub curia cases" many of which are worthy of most careful and prolonged consideration and the most industrious legal research, persuades me to a belief in the wisdom of some of these observations, and to a not unwilling acceptance of the proposition that exhaustion produces the *toxin of fatigue,* the presence of which is evident to me as I sit here all day in a niche on the fifth gallery of the Peabody Library on this sublime occasion dedicated to a solemn commemoration of the signing of the Armistice, and to a contemplation of the glories of patriotism and the grandure of liberty, of mind, of body and of soul.

I am conscious of the effects of toxin and fatigue that makes for "carelessness and indifference in workmanship." I am conscious of that "degradation" resulting from long hours producing a "mechanical and absorbed mind," "indifferent alike to home and the wider interest in life," a degradation "more subtle" because we have become "more self absorbed," and that the effects are not less regrettable, because they have become more "subtle." I am conscious of a gross neglect today of the "leisure" provided by the Legislature for what Emerson calls "the cultivation of the soul," and what the above authorities style "higher standards of living," the "development of a more healthy home life necessary to the safety of the nation." Not wholly unmindful of the duty to respond to this high call, the degradation of long hours

is borne in on one, not merely as beautiful theory of political economists, but as one of the stern realities of life.

If legal vision has been thereby blinded, and perceptions of recognized principles have ceased to be acute, and the toxin of fatigue has left visible evidence of "indifference in workmanship," increasing thereby the burdens of litigants in the taxation of costs of appeal, it is abundant evidence of the evils of long hours of labor, and only further demonstrates that the output of the last of such hours can be expected to show "a steady and marked decline."

Therefore, let the demurrer be overruled, and let the injunction now issue, with leave to the defendants to move to dissolve the same upon giving five days' notice to the complainant of such motion.