LOWRIMOORE et al. v. UNION BAG & PAPER CORPORATION.
Nos. 22, 24, and 26.

District Court, S. D. Georgia, Savannah Division.

Nov. 15, 1939.

648

John J. Hennessy, Ulmer & Dowell, Lawrence J. Dwyer, and Wm. H. Boyd, all of Savannah, Ga., for complainants, also as amicus curiæ counsel for the Wage and Hour Division, United States Department of Labor.

Abrahams, Bouhan, Atkinson & Lawrence, of Savannah, Ga., and Lindsay Goeltz, of New York City, for defendant.

Joseph Diehl Fackenthal, of New York City, for New York Trap Rock Corporation, amicus curiæ.

### Statement of Issues.

BARRETT, District Judge.

This is a civil action brought by employees against their employer, the Union Bag & Paper Corporation, under the provisions of Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216 (b). This section provides as follows: "(b) Any employer who violates the provisions of section 6 [206] or section 7 [207] of this Act [chapter] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

Section 6, 29 U.S.C.A. § 206, the minimum wage provision of the Act, provides that "every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages" at the rate of "not less than 25 cents an hour" during the first year from the effective date of the Act, that is from October 24, 1938 to October 24, 1939. After October 24, 1939 the minimum wage becomes 30 cents an hour under Section 6.

Section 7, 29 U.S.C.A. § 207, the overtime provision, requires that the employer shall not "employ any of his employees who is engaged in commerce or in the production of goods for commerce * * * for a workweek longer than forty-four hours * * * unless such employee receives compensation * * * at a rate not less than one and one-half times the regular rate at which he is employed" for his employment in excess of forty-four hours a week. On October 24, 1939, the minimum workweek becomes forty-two hours and overtime attaches for hours in excess of forty-two per week.

The plaintiffs have been employed as bargetenders by the defendant for varying lengths of time since October 24, 1938, the effective date of the Fair Labor Standards Act. They have brought this action to recover the amount of any unpaid minimum wages and unpaid overtime compensation and an addition equal amount as liquidated damages, together with a reasonable attorney's fee pursuant to the right conferred by the Act.

In its answer the defendant contends that it is not indebted to the plaintiffs under the Fair Labor Standards Act on two grounds: first, that the plaintiffs are employed as seamen within the meaning of the exemption provided by Section 13(a) (3) of the Act, 29 U.S.C.A. § 213(a) (3); second, that even if the plaintiffs are not employed as seamen they have not actually worked over 44 hours a week and have received wages at a rate of not less than 25 cents an hour. It is conceded that the plaintiffs are within the coverage of the Fair Labor Standards Act except as maintained above.

### Findings of Fact.

The defendant, at its Savannah plant, is engaged in the manufacture of paper bags, pulp and other products for interstate commerce. The chief material used in this process is pulpwood or timber obtained from sources in Georgia, South Carolina and Florida and transported on barges owned and operated by the defendant from landings on inland waterways in Georgia, South Carolina and Florida to Savannah

for use in the manufacturing enterprise at Savannah. These barges are not self propelled, but are towed by tugs to and fro between Savannah and the landings. They do not operate on the high seas.

These barges generally made five trips every two months and occasionally six trips. The trips require from about 24 to 40 hours out and coming back about twice as long. Upon reaching the landings the tug leaves the barge, to be loaded by contractors, such loading requiring from three to five days, during which time the bargetender had no other duties than to see to it that the barge was loaded evenly and not too near the edge. It was the duty of the contractor to see to it that no unsuitable pulpwood was placed on the barge.

The unloading at Savannah was done by the company, during which stay in Savannah the bargetender had only these duties: If his barge was the only barge there he still had to care for it and pump out the bilge water, but need not eat on the barge or stay on it all the time. He could go to his home, and did go to get groceries. If there were several barges it was permissible for only one bargetender to be in charge, and all the other bargetenders had no duties during such conditions. Prior to leaving again the bargetender had to get dry wood and kerosene oil for use while on the journey out to the landing and back. The obtaining of such wood and kerosene should not require more than an hour. It was the duty of the barge man to keep the barge clean, to be on the watch out for fire and to pump the bilge water when necessary. The barge man had no duty in connection with navigation, but was subject to the orders of the captain of the tug when in tow. The bargetender put out the anchor or helped in it, tied the boat moorings or helped in it, provided the appropriate slack if needed to care for the rise and fall of the tide by loosening or tightening the mooring ropes; was on duty, except when at Savannah as stated above, in the sense that he was required to be on or near the barge and on the watch out for 24 hours, but does not claim even that he was at work all of the 24 hours, though he was subject to call when it was necessary. The bargetender while absent from Savannah slept on the barge and prepared his own meals at his own expense. While at Savannah he had no duties to perform at the mill.

The tug's captain and crew are primarily responsible for the proper handling of the towing and for the mooring ropes. The barges have no rudder or steering device. The bargetender is charged with no duty of avoiding obstruction to navigation or in escaping collisions. He signs no shipping articles and is not hired on the vessel for any definite voyage or by the month, but for a period consisting of a number of round trips.

The testimony of Mr. Lowrimoore, whose testimony was to be accepted for all the barge men, as to the duration of his work was that he did not consider that he was at work the entire 24 hours, that he kept no record of how much he was at work, and the extent to which he went in fixing the hours of his work was ultimately summed up—after disclosing that he had no record and kept no time—as "I reckon about twelve hours". He was satisfied with his job.

The bargetender and the captain of the tug made reports of the trip of each barge, and one report was introduced in evidence as an example and it showed the dates of the departure from Savannah, of arrival at destination, started loading, finished loading, left for mill and arrival at mill; and Lowrimoore's pay was from October 25, 1938 to December 15, 1938 $62.25 and from December 16, 1938 to February 20, 1939 $87.98, total pay 17 weeks $157.21.

I find that there is no sufficient, satisfactory evidence upon which could be fairly found a judgment showing the number of hours that the barge men were at work. The burden is of course upon them to establish by a preponderance of the testimony what they affirm to be true, that is, that they worked beyond the 44 hours a week and were paid less than the required amount of 25 cents an hour.

The only expert testimony as to whether under the existing facts the barge men were seamen was that of Frank W. Spencer, who is a master mariner and a licensed chief engineer for ocean going vessels and had had 35 years experience, and claimed to be entirely familiar with the duties of a seaman and what constituted a seaman. His testimony was definite and positive that under the facts as disclosed in this case the barge men were seamen.

In view of the decisions of various courts that have been cited on both sides I deem it appropriate not to rest my decision upon the opinion of captain Spencer.

but to examine the various decisions, in order to reach a correct conclusion as to whether under the existing facts the barge men were or were not seamen under the Act in question.

### Law.

Aside from the question as to the number of hours the complainants worked the sole question in this case is: Were the complainants seamen under the provisions of the "Fair Labor Standards Act of 1938"?

In sections 6 and 7 of said Act provision is made for minimum wages and maximum hours, respectively, and the claims now under consideration are based upon such provisions.

Section 13 of said Act provides: "Sec. 13 [§ 213]. (a) The provisions of sections 6 [206] and 7 [207] shall not apply with respect to * * * (3) any employee employed as a seaman."

If this case were based upon the Longshoremen's and Harbor Workers' Compensation Act, § 3(a) (1), 33 U.S.C.A. § 903 (a) (1), authority has been furnished which might sustain the contention that the complainants were not seamen. De Wald v. Baltimore & O. R. Co., 4 Cir., 71 F.2d 810.

Several features are to be noted in connection with the case cited. The provision of said Act for recovery is as follows: "(a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. No compensation shall be payable in respect of the disability or death of—(1) A master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."

The opinion recites, 71 F.2d page 812: "For certain purposes De Wald comes under the category of a seaman. Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047; 11 Ann.Cas. 589. But it does not follow that he was a seaman in the true sense of the word; one who engaged in voyages upon a ship or vessel and assisted in the navigation of the vessel and is exposed to the perils of the sea or in other words a seaman in the common acceptance of the meaning of the word."

The deputy commissioner found, 71 F. 2d page 812, that De Wald's main duties were: "checking and supervising the loading and unloading of cargo from barges and keeping all records with regard to the cargo. Such work as he did in making fast lines at docks or alongside vessels and pumping water out of the barges was incidental to his main employment. He did not live upon the barge but went home every night. The barges were not navigated under their own power but were towed and never left the harbor."

The Act defines employers thus: "The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock)." 33 U.S.C.A. § 902(4).

At the very close of the opinion we find this: "Before the passage of the act scows and barges have been held by various courts to be vessels, but these decisions were not made in interpreting the intent of the Longshoremen's Act and in view of our conclusion that De Wald was not a member of a crew it is not necessary to decide this point."

Citation is made of the case of Nogueira v. New York, New Haven & Hartford R. Co., 281 U.S. 128, 50 S.Ct. 303, 74 L.Ed. 754, wherein Mr. Chief Justice Hughes says: "The general scheme of the Longshoremen's and Harbor Workers' Compensation Act was to provide compensation to employees engaged in maritime employment, except as stated, for disability or death resulting from injury occurring upon the navigable waters of the United States where recovery through workmen's compensation proceedings might not validly be provided by state law."

As further authority, as agreeing with the De Wald case, see Diomede v. Lowe, 2 Cir., 87 F.2d 296.

Another case relied upon by complainants is Moore Dry Dock Company v. Pillsbury, 9 Cir., 100 F.2d 245. The opinion, on page 246, contains the following: "Although the Courts thus far have not formulated a precise statement from which it can at once be determined just when an employee is a member of a crew and when he is a harbor worker; they are in agreement upon the principle that Congress, in the enactment of the Longshoremen's and Harbor Workers'

Compensation Act, intended to exempt from the operation thereof only those employees ordinarily and generally considered as seafaring men, leaving that fact to be determined by the circumstances of each case. Mr. Chief Justice Hughes, in the case of Nogueira v. New York, N. H. H. R. Co., 281 U.S. 128, 50 S.Ct. 303, 74 L.Ed. 754, commenting upon the legislative history of the Act, among other things, says [281 U. S.] at page 136, 50 S.Ct. at page 305 [74 L. Ed. 754]: 'When the bill which became the Longshoremen's and Harbor Workers' Compensation Act was pending in Congress, the importance of the policy of compensation acts, and their advantages in providing for appropriate compensation in the case of injury or death of employees, without regard to the fault of the employer, were distinctly recognized. It appears that the bill originally excluded a master or members of a crew of a vessel, but was amended so as to extend to them the benefits of compensation. House Rep.Mo.1767, 69th Cong., 2d Sess. As these seamen preferred to remain outside of the provisions of the bill, they were finally excluded; and the bill was passed with the exceptions above-quoted. Cong. Rec., 69th Cong., 2d Sess., vol. 68, pt. 5, 5908.' "

See also South Chicago Coal & Dock Co. v. Bassett, Deputy Com'r, 7 Cir., 104 F.2d 522.

### "Seamen"—Varying Meanings.

It is universally recognized that the term "seaman" has a flexible meaning. It has varied from time to time in the history of the development of navigation and other activities on the water. It has some times varied by reason of specific definition in a statute, and it has been enlarged in its scope by reason of seamen being members of "a favored class". It has at times been extended so as to include those who were in terms recognized as not being "seamen". International Stevedoring Co. v. Haverty, 272 U.S. 50, page 52, 47 S.Ct. 19, 71 L.Ed. 157, where it was held that a stevedore was entitled to recover for personal injuries under the Merchant Marine Act of June 5, 1920, § 33, 46 U.S.C.A. § 688, though the opinion states: "It is true that for most purposes, as the word is commonly used, stevedores are not 'seamen.' But words are flexible. The work upon which the plaintiff was engaged was a maritime service formerly rendered by the ship's crew. Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 62, 34 S.Ct. 733, 58 L.Ed. 1208, 51 L.R.

A.,N.S., 1157. We cannot believe that Congress willingly would have allowed the protection to men engaged upon the same maritime duties to vary with the accident of their being employed by a stevedore rather than by the ship. The policy of the statute is directed to the safety of the men and to treating compensation for injuries to them as properly part of the cost of the business. If they should be protected in the one case they should be in the other. In view of the broad field in which Congress has disapproved and changed the rule introduced into the common law within less than a century, we are of opinion that a wider scope should be given to the words of the act, and that in this statute 'seamen' is to be taken to include stevedores employed in maritime work on navigable waters as the plaintiff was, whatever it might mean in laws of a different kind."

As early as 1882 it was held that: "Persons employed upon a fishing tug, solely for the purpose of catching and preserving fish, are entitled to proceed against the vessel for the recovery of their wages, notwithstanding the fact that they take no part in the navigation of the vessel, and that an incidental portion of their duties is performed on shore." The Minna, Dist.Ct. of Michigan, 11 F. 759.

In 1897 there was decided the case of Lawrence v. Flatboat, 84 F. 200, by the District Court of Alabama, where it was held: "A flatboat, with a pile driver and its engine erected thereon, which is mainly used in constructing bulkheads for the erection of channel lights, and which is also employed in transporting materials used in the work (being towed by a tug for this purpose), is to be classed as a 'vessel,' within the maritime jurisdiction, and subject to maritime liens." The opinion in this case cites a number of earlier decisions to the same effect.

That "seamen" may include persons who otherwise might be deemed not to be "seamen" see Warner v. Goltra, 293 U.S. 155, 162, 55 S.Ct. 46, 79 L.Ed. 254, citing Uravic v. Jarka Co., 282 U.S. 234, 51 S.Ct. 111, 75 L.Ed. 312.

That flexibility may be applied to "seamen", especially when the question of wages may be involved the following quotation from Warner v. Goltra, supra, 293 U. S. at page 162, 55 S.Ct. at page 49, 79 L. Ed. 254, is interesting and informative "The case for the respondent reduces itself to this; that by express or implied antithesis

the word 'seaman' is used in many statutes to designate a class of mariners exclusive of the master. It is also true, however, that in these same statutes a seaman excludes a stevedore. A goodly number of the statutes where the antithesis is sharpest lay a duty upon the master to be performed for the ,seamen under him. In laws so framed, there is no room for construction. A goodly number in addition give.a remedy to seamen for wages wrongfully withheld, or define terms of· payment that agreement may not vary. `In respect of dealings of that order, the maritime law by inveterate tradition has made the ordinary seaman a member of a favored class. He is a 'ward of the admiralty,' often ignorant and helpless, and so in need of protection against himself as well as others. `The master, on the other hand, is able in most instances to drive a bargain for himself, and then when the bargain ,is made, to stand upon his rights. Discrimination may thus be rational in respect of remedies for wages. The Bethulia (D.C.) 200 F. 876; The Putnick (D.C.) 291 F. 902."

.Again in Warner v. Goltra, supra, it is said: "There are contexts in which the word seaman is held to exclude the master or even any officer. [Citations]. There are other contexts in which it takes them in. [Citations]."

It is thus manifest that flexibility may be employed to include as "seamen" those who would not originally be considered as such. Can such flexibility be employed by making "seamen", as generally understood, "non-seamen"? Would it not be a fair test to conceive of a case where the complainants in this case were seeking to enforce their rights as seamen and would it then be held,—especially in view of the fact that a seaman is a "ward of the admiralty",— that these men were not seamen? That different remedies and even multiple remedies may be provided for one who has a claim against another, whether the claimant be a seaman or otherwise, is recognized, but can a "seaman" be made a "non-seaman", or a· "non-seaman" a "seaman" under the same facts, unless there be varying definitions controlling the same, or unless there be coercive reasons to justify such contradictory interpretation of facts?

The ultimate controlling question is: Are the conditions under which the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., was passed, or are its purposes, such as to justify the construction that under the

existing facts if in the absence of such Act the complainants would be held to be "sea-. men", was such Act intended to and does it take away from such complainants their rights as seamen and deny to them their right to be paid their wages to the end of the journey or care in case of sickness, as is provided for in the maritime law?

Must we not pause before undertaking, as a court, to take away such rights, and thus convert ourselves into the Congress, which would be able to do this?

A valid reason which seems to justify leaving seamen out of the effects of this Act is the practical difficulty of establishing by any satisfactory evidence what were their hours of work, when they as employees were always or nearly always subject to call, though a large and indeterminate portion of their time was not occupied with work. There is no machinery or formula provided for satisfactorily ascertaining the hours of work under the conditions as portrayed in this case. Should it not be fairly assumed that Congress realized this difficulty and therefore excepted "seamen" from the provisions of the Act dealt with herein? Does not any other view require the conclusion that Congress intended· that the word "seamen" should have one meaning under certain facts when one relief was sought and a directly contradictory meaning when *under the same facts* a different relief was sought? Or, to put it slightly differently; "seamen" under identical facts meant the exactly opposite depending upon who were the complainants?

Force is given to the view that "seamen" wished to be continued as such and to continue under the maritime law rather than under the Fair Labor Standards Act by their representatives so stating to the Committee having under consideration the latter bill. The requests of such representatives need not be interpreted as binding upon all classes of seamen, but it at least shows the possibility of all seamen preferring to be under the maritime law. Shall such choice be denied them because under the particular facts of this case they might have substantial benefits by not being held to be "seamen."

█ The Fair Labor Standards Act may be considered a remedial statute inasmuch as it was intended to bring substantial benefits to a vast number of employees of all kinds and classes, but it surely was not intended to relieve any special evil that was confined to those who, in the absence of

such Act, would come within the definition of "seamen". Flexibility, in the meaning of words, can not therefore find force in treating "seamen" as "a favored class" in construing such Act, especially when in so doing certain existing rights belonging to them as "seamen" would be destroyed.

### Conclusions of Law.

1. Proof as to the number of hours worked is not sufficient to reasonably establish such hours. Such proof was at least only a guess. It is for Congress—not the Administrator or the court—to establish rights and punishments by guess work, especially when the Act provides for computation based upon definite amounts of time and wages. If Congress desired different rules of evidence or different methods of computation it can provide them, as it has done in the case of damages by infringement of patents. 35 U.S.C.A. § 70.

2. Complainants are "seamen" and therefore are excluded under Sec. 13 (a) (3) of the Fair Labor Standards Act. This follows if controlled by the sole expert testimony submitted, that is, that of Frank W. Spencer, which was not contradicted. My conclusion is however sustained by the definitions of "seamen" in many courts.

3. Complainants are not entitled to recover anything in these suits.

4. Costs are to be taxed against complainants.

Let a judgment be entered accordingly.