**WOODS v. WILKERSON.**

No. 460.

District Court, W. D. Louisiana, Shreveport Division.

July 17, 1941.

J. B. Crow, of Shreveport, La., for plaintiff.

Foster, Hall & Smith, of Shreveport, La., for defendant.

PORTERIE, District Judge.

The defendant in this case, through pleading disclosure, immediately became the W & W Oil Co., Inc.; the plaintiff had dealt with Mr. F. E. Wilkerson individually, not knowing that he was the managing officer of the corporation.

The suit is by plaintiff, under the Fair Labor Standards Act, §§ 6, 7, 16, 29 U.S. C.A. §§ 206, 207 and 216, Public No. 718, 75th Congress, 52 Stat. 1060, and in substance is for an alleged balance due of wages in the sum of $654.30, plus a penalty in the like amount, and for reasonable attorney's fees in the sum of $350, making a grand total of $1,658.60, with five per centum per annum interest from judicial demand until paid.

The main defense is that plaintiff-laborer, in addition to the work done by him as a pumper of the stripper wells of defendant, was concurrently employed as a pumper of the stripper wells of one Boss West.

The court has ruled that the plaintiff here is one American laborer and that under the Act the two concurrent salaries are to be added and the number of hours given by the laborer to both jobs as pumper are to be likewise added, and then the status of the laborer is to be considered in view of the provisions of the Act. We cannot exclude the defense made and blind ourselves to the additional revenues of plaintiff, and thus cast the defendant.

As to the amounts received by the plaintiff for his joint labor as pumper of stripper wells located on two adjacent premises, there is no difference between the litigants; the amounts have been placed in the record by stipulation; better than that, the original checks received by plaintiff-laborer from the W & W Company are in the record, and photostatic copies of the checks received by plaintiff-laborer from his co-employer, Mr. Boss West, are in the record.

The amount received by the laborer in this case from the defendant for the period of employment of ten and one-half months was $840, or an average of $80 per month; concurrently, the amount received by the

laborer from Boss West was $610 for a period of eleven months, or the average per month of $55. The average joint salary per month received by the plaintiff, therefore, was $135. The above facts were reached through a short pre-trial conference.

The court now arrives at the only place in the case where its judgment is to be exercised, and that is in the determination of the number of hours the plaintiff worked per day for the two employers. We had a number of witnesses.

The evidence of plaintiff must first be considered. His contention is that it took two hours per day to attend the Boss West wells and that he then gave twelve hours of work per day to pumping stripper wells of the W & W Co. He placed in evidence a time-book, prepared by his wife, wherein, without exception, from January 1, 1940, to November 26, 1940, there is the entry "12" as being the number of hours given each day. This exact number of hours for each day, in the opinion of the court, is an impossibility because of the character of work in which plaintiff was engaged. This is not the court's first case with this particular type of laborer; in further support, we quote paragraph 7, at page 5, of Interpretative Bulletin No. 13, dated November, 1940, of the U. S. Department of Labor, Wage and Hour Division.

"In some cases employees are engaged in active work for part of the day but because of the nature of the job are also required to be on call for 24 hours a day. Thus, for example, a pumper of a stripper well often resides on the premises of his employer. The pumper engages in oiling the pump each day and doing any other necessary work around the well. In the event that the pump stops (at any time during the day or night) the pumper must start it up again. Similarly, caretakers, custodians, or watchmen of lumber camps during the off season when the camp is closed, live on the premises of the employer, have a regular routine of duty but are subject to call at any time in the event of an emergency. The fact that the employee makes his home at his employer's place of business in these cases does not mean that the employee is necessarily working 24 hours a day. In the ordinary course of events the employee has a normal night's sleep, has ample time in which to eat his meals, and has a certain amount of time for relaxation and entirely private pursuits. In some cases the employee may be free to come and go during certain periods. Thus, here again the facts may justify the conclusion that the employee is not working at all times during which he is subject to call in the event of an emergency, and a reasonable computation of working hours in this situation will be accepted by the Division."

The court differs from the above quotation in one particular: that neither in this case nor in any other case wherein the labor of pumper of stripper wells was involved did the evidence show that the pumper was at all concerned with doing anything about a well that stopped in the night. The fact is he does not know when the well has stopped in the night. His employer does not expect him to know. There is no irreparable injury from the stoppage of the well during the night. The well is merely put on the pump the next morning when discovered stopped, and operated for a longer period of hours, as most wells are run intermittently. In the case at bar, an economic operation of the wells is four hours on and four hours off. The very character of the oil-holding stratum in this area indicates the advantage of discontinuous and intermittent pumping.

The evidence is that about halfway during the period of employment of plaintiff a second pumper was placed to relieve him. The fact that an additional man was placed is no indication that the plaintiff was doing more work than one person could do, for during the period when the one pumper (plaintiff) was used the defendant was engaged in oil exploitation, developing more wells, and the night drilling crews would overlook the nearby wells as to whatever attention they needed, if any, during the night. The plaintiff began with having only two wells to look after, as the defendant had only two wells in January of 1940; then, on March 4, a third well was developed for pumping; on April 19, a fifth well, then a sixth of June 1; another on June 28, and the last on September 20, all pumpers.

The claim of plaintiff is that he gave twelve hours of time to defendant's wells and two hours to those of Boss West, or a total of fourteen hours of work per day. Pumpers of stripper wells make two visits to each well per day. The engines are of the same type as used in automobiles. The pumper oils the motor when necessary, cranks an engine if it be stopped, walks

from well to well (some of them use an automobile, when physically advantageous), and sometimes treats oil for B. S. & W., which takes about fifteen or twenty minutes; the setting from this occurs in from twelve to forty-eight hours and he does not have to be around during the period.

The perplexing question with the court is that no one can arrive by direct evidence at exactly how many hours per day this type of laborer is entitled to for services rendered. It is not the same case as when a night watchman is at work; he punches a clock at a certain hour when he begins his beat, and every hour thereafter he has to do the same thing over the plant area. This man is entitled to the full time that he remains on the premises, even though in between each round he is sitting down. It is preponderantly clear from the witnesses in this case that a pumper of stripper wells does not burden his mind with his labor in between the two trips each day. He may go fishing or work in his vegetable or flower garden, or take another job.

Since plaintiff has left his position, one Rowell has replaced him, and in an actual clock check for sixteen consecutive days on the same job, overlooking the same wells, excluding those of Boss West however, the greatest period of time consumed was seven hours on one day, and the least time was three hours on three days. The average time for the period per day is four hours and thirty-six minutes. If the court were to allow the double of this time because of the mental burden on the pumper, the result would still be only a total of nine hours.

The defendant has proved itself to be a fair employer, in the opinion of the court. It knew Woods was being employed by West and Mr. West was sounded before Woods was employed in the second position as pumper. There being but two wells (one irregular) to look over, the initial salary was agreed to at $65 per month. Then a third well came in January and was placed on the pump ten days later. At this time Woods was given free ground rent so that he could build himself a house on the property of defendant. When two more pumping wells came in June, the salary was raised to $87.50 per month.

There is a factual situation which precludes the recovery of plaintiff in this case. If we were to allow twelve hours (ten plus two) per day on the wells of both the defendant and Mr. West, seven days per week, the computation shows, allowing for overtime, etc., under the Act, that the amount of $127.20 is reached. The payment of $135 per month is therefore a compliance with the Act by the employers.

 It is impossible for the court to conscientiously allow fourteen hours per day to the plaintiff herein, twelve hours to the defendant's wells and two hours to those of Boss West, because the defendant had several reputable, credible witnesses to prove that plaintiff was looking over the Boss West wells during the same twelve hours and during the time that he looked over the W & W wells. The court really believes that the maximum number of hours that plaintiff ever used on both sets of wells on any one day was eight hours. We see no way of allowing plaintiff any recovery.

It has been proved that all the wells of both owners may be included in the area of a circle whose radius is less than two miles. In fact, excluding the Mitchell well No. 1, which was pumped but for the short period of about three weeks, the wells are within a radius of one mile. This proves that but little time was needed by plaintiff to walk from one well to another.

Plaintiff's claim must be dismissed at his cost, and judgment will be signed accordingly.