## THOMPSON v. LORING OIL CO.

### No. 649.

District Court, W. D. Louisiana,
Shreveport Division.

May 6, 1943.

J. S. Pickett, of Many, La., and Simon Herold, of Shreveport, La., for plaintiff.

Cook, Lee, Clark & Egan, of Shreveport, La., and Basil H. Lucas, Jr., of Pittsburgh, Pa., for defendant.

DAWKINS, District Judge.

This suit was filed in the state court for the Parish of Sabine and removed here on the ground of diverse citizenship. It demands the sum of $4,196.30 as overtime and penalties for labor alleged to have been performed as an oil pumper. The petition alleges that the plaintiff was entitled to pay for 12 hours a day 7 days a week for the period from March 1, 1941, until December 27 of that year; that he was paid for 35 hours a week, while he worked 84; that his base pay was 71¢ per hour and for the first 40 hours he was entitled to receive $28.40, but for the additional 44 hours he should have received pay for 1½ times the regular rate or $1.065 per hour in addition to $48.86 per week; that after deducting what he actually received at 71¢ an hour for 35 hours a week, there remained due to him the sum of $2,021.47, and that under the "Fair Labor Standard Act" of 1938, 29 U.S.C.A. § 201 et seq. he was entitled to recover the same amount additional, thus making the total the sum sued for.

Defendant answered that it had paid plaintiff at the rate of 71¢ an hour for a work week of 35 hours, and for all overtime "in excess of 35 hours of work per week, plaintiff was paid on the basis of $1.065 an hour which included all that was due him".

The evidence shows that the duties of plaintiff required him to visit and look after some six pumping wells. "Two of the wells were about a mile and a quarter north of where plaintiff lived, there was another well about a mile and a quarter east of him, there was another well about three miles south of him, and another well about a mile and one-half or two miles west, and still another well, called the Martinas Well, approximately seven miles west of where he lived".

Formerly there had been three persons employed to perform this service, but be-

ginning March 1, 1941, they were reduced to two. Plaintiff would take over at 12 o'clock midnight and the other man would relieve him at noon midday. When plaintiff went on duty he would first take the other pumper to his home, a distance of approximately a mile and a half and "go back by two wells that was north of me". If any trouble was found he would either go on to the others and back later, or would correct it at that time, if he could. Where the trouble was such as with spark plugs, magneto, or a belt had slipped, he would repair it, but if more serious, he would "report it to the office before 7 o'clock in the morning." He serviced five of the wells once a day and the sixth once a week, the latter being the Martinas Well, which was some 7 miles distant.

He further testified that the wells were equipped with a device called a "barker", fastened on the exhaust pipe of the engine, the sound of which, as to the wells near his home would wake him up if anything went wrong. If all the wells were working smoothly he could make the rounds in an hour, but if not, it took longer, the average being from one to three hours. After making his rounds, shortly after going on duty, he would go to his home and go to bed, but had to report at the office about 7 o'clock A. M. After that, until 12 o'clock noon, he was subject to call. If he worked after mid-day he was paid at the same rate of 71¢ an hour. He was credited on the payroll with 35 hours a week or 5 hours per day for 7 days, and such additional time as, according to the defendant's contention, he actually worked. Plaintiff signed the payrolls, received his checks, and made no protest about being paid for five hours a day.

Plaintiff called as a witness in his own behalf one John Strong, who filled in for plaintiff a week while the latter was off duty. Strong testified that the truck would be turned over to him at 12 midnight. At about 4 A.M. he would make the rounds but because of his unfamiliarity with the situation, it would take him until about 7 o'clock to get back, and "if everything was running good I went back to the house and stayed until about 11 o'clock, and then made the two wells close to where I lived and turned the truck over to Mr. Barr (the other pumper) around 11:30 or 12:00 o'clock".

Plaintiff's wife was also called and testified that he took over the car at 12 o'clock, and in response to plaintiff's counsel, gave answers as follows:

"Q. During that period of time, what time of night or day did he go to work? A. Well, did you just want me to tell the hours? He went to work at —he took over the car at twelve o'clock at night.

"Q. How long would it be before he would come back to the house when everything was going well? A. I couldn't tell you every time, but sometimes it was several hours and he would come in and maybe sleep awhile and then get up. He always ate breakfast between six and six-thirty, and went up to the office by seven. But of course I couldn't tell you every time because I don't know.

"Q. Would you know that he was called away from the house at all hours? A. I didn't get that.

"Q. Was he called to go to the lease' at all hours of the night? A. Yes, sir, from twelve at night to twelve next day."

Emmett Remedis, called on behalf of plaintiff, testified simply as to the character of the roads over which plaintiff had to travel, and that he (Thompson) came back home each day about 12 o'clock noon.

In addition to the above, plaintiff called on cross examination Nolan Winn, who was one of the superintendents during the time plaintiff worked for defendant, and who testified that plaintiff worked as a rule five hours a day 7 days a week, but when asked if plaintiff worked from 7 in the morning until noon, answered, "No sir, I do not think so". He said that the five hours with which plaintiff was credited was not for the period from 7 to 12 A. M. but "covered five hours, no matter what time he might put in". Finally the witness explained:

"He was required to put in five hours a day from 12 midnight to 12 noon; anytime during that time".

J. M. Blair, another superintendent for the defendant, was also called on cross examination. He had worked for the defendant up to April 1, 1941 (one month after plaintiff started on the two day shift), and both he and Winn were working for a "connected company" at the time they testified and Blair has been in Illinois since April 1, 1941. He said that plaintiff was not required to stay on the job the whole 12 hours, and his pay was "for the five hours he put in, sometime during that period". Asked if plaintiff "was told to quit after he worked five hours" Blair replied, "I do not remember". Plaintiff was paid overtime or-

given time off the next day in case he did work over five hours during one day. When three pumpers were used they were each subject to call for 8 hour shifts but they did not work 8 hours and were also credited with five hours a day whether they worked that much or not. The witness kept the time while he was with defendant and "was supposed to know" how long plaintiff worked. The roustabouts worked six hours a day but only six days a week. Everyone then worked 35 hours a week. He testified that the payroll sheets showing time plaintiff worked were correct. The witness lived at the warehouse, about three miles from plaintiff's residence, and also made the rounds of the wells every day himself.

Plaintiff finally called J. T. Paul, an employee of the Standard Oil Company, to prove that the oil produced from the wells serviced by plaintiff went into its pipe lines and became a part of interstate commerce.

Defendant, as its first witness, recalled Blair, who said he had been in charge as superintendent for defendant some 7 years up to the time his connection with it ceased on April 1, 1941, and that plaintiff had also been employed there during this period as a pumper. Defendant's counsel asked and he answered questions as follows:

"Q. I will ask you to state to the Court, Mr. Blair, just the instructions given to those pumpers with reference to their respective duties as to the six wells you have just referred to. A. Well, they were instructed to make the rounds of these wells. We figured their pay at five hours a day, but they would be subject to call from twelve to twelve; but they were not required to stay on our property. They could go to town or go home and eat their meals or sleep, or go fishing if they wanted to. It was the company's duty to hunt them up if we needed them for any specific duty.

"Q. What would you to say as to the length of time, on an average, that it took to service these wells?

"Mr. Herold: We object, unless the witness knows of his own knowledge.

"The Court: He has already testified this morning that he daily visited the locations himself.

"A. A fair average would be three hours a day."

\*　　\*　　\*　　\*　　\*

"Q. Did you issue any instructions with respect to the number of hours to these men, at the time you were there? A. We instructed them not to work over five hours in any one day, and in case they did they could take it off some other day within the same week; otherwise they would be paid overtime, if they couldn't make up this time within the week. Like if they worked seven hours today, they could take off early tomorrow.

\*　　\*　　\*　　\*　　\*

"Q. I understand that prior to March 1, 1941, three pumpers were employed? A. That's right.

"Q. And the change was made on March 1, 1941? A. That's right.

"Q. What brought about that change? A. Well, the wells had settled down to steady production and had fell off so much and it was necessary that we reduce operating expenses. It didn't necessarily increase anybody's labor as far as that was concerned.

"Q. Did that mean that the wells got less attention after March 1st than before the 1st of March? A. That's right. We had three pumpers who made three rounds. After March 1st we just made two rounds instead of three."

Alton Barr, the other pumper, on the shift from 12 noon to 12 midnight, at the same time plaintiff was working, was called by defendant. He testified that he was no longer with defendant, but employed by another company "owned by the same people". He answered questions by defendant's counsel as follows:

"Q. What was the average number of hours you put in on that lease pumping the wells? A. It varied up and down, some days not much to do, and the next day there'd be quite a bit.

"Q. What instructions, if any, did you receive from Mr. Blair with respect to the number of hours to be worked on that lease? A. When they let the other pumper off and put us on, he told us the wells had to go, but didn't want us to work over five hours."

\*　　\*　　\*　　\*　　\*

"Q. About how long would you say it took you to service the wells after you went on duty, about how many hours? A. If some of them were down it would take longer. But if all were running all right it wouldn't take but possibly a couple of hours. It would go up and down. I couldn't tell exactly.

"Q. Was five hours a fair average or not? A. Some days it would take all that, and some days maybe not that much; other days it would take more.

"Q. What, if anything have you to say, Mr. Barr, with respect to your time after you made the rounds of the wells. Were you required to stay on the lease, or could you go wherever you wished? A. There was one well on the other side of town, and that made town between them. I would come through town, and sometimes go home, and sometimes hang around and talk to some of the boys.

"Q. You weren't required to stay on the lease, or were you? A. No sir, not the whole twelve hours."

On cross examination he testified as follows:

"Q. If you worked all day one day, would you go to work the next day at all, or would you take off? A. When I had to go out in the morning to help pull a well they would give me overtime for that.

"Q. What was your rate of pay? A. Seventy-one cents an hour.

"Q. When you got paid overtime did you get paid at the rate of seventy-one cents, or time and a half? A. Time and a half I think.

"Q. When you signed the payroll sheet it would show you worked five hours every day wouldn't it? A. Yes, Sir.

"Q. They wouldn't ask you how much you worked any one day before that was made up? A. No, sir.

"Q. After you went on to work, starting at noon, was there any particular time that you knew you would be off between then and midnight? A. No, you couldn't tell, owing to how the work would turn out. It wouldn't run the same. No well operates the same day in and day out.

"Q. And it might have been you would have to work straight on through the twelve hours? A. Could have been.

"Q. Could you have taken another job and expected to hold it, that required you to work during that time? A. I didn't do it.

"Q. You couldn't count on going to work at any certain time for any other job could you? No."

 It thus appears that plaintiff has not only failed to establish with any degree of certainty that he actually worked in ex-cess of the 40 hours provided by the Fair Labor Standards Act but the preponderance of the evidence is that he worked less and that when he did any extra work, which was seldom, he was paid for it. For this reason there is nothing upon which a recovery can be based, unless it is on the theory that since he was subject to call for the 12 hour period, he should be paid for the full 12 hours per day. The burden was upon plaintiff to prove with reasonable certainty the hours he actually worked. See Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172; Lowrimoore v. Union Bag & Paper Corporation, D.C., 30 F.Supp. 647; Willett v. Magnolia Petroleum Co.,[1] U.S.D.C.N.D.Tex. Feb. 6, 1941.

In July 1939, the administrator of the Fair Standards Division of the Labor Department issued interpretative bulletin No. 13, the pertinent portions of which are as follows:

"Hours Worked General Factors.

"2. The act contains no express guide as to the manner of computing hours of work and reasonable rules must be adopted for the purposes of enforcement of the wage and hour standards. As a general rule, hours worked will include (1) all time during which an employee is required to be on duty or to be on the employer's premises or to be at a prescribed work-place. * * * The following specific problems with respect to the determination of hours worked which have been presented for our consideration are not sufficiently answered by this formula, however, and more detailed discussions of these problems are, therefore, set out in the following paragraphs.

* * * * * *

"Caretakers, Custodians, etc.

"7. In some cases employees are engaged in active work for part of the day but because of the nature of the job are also required to be on call for 24 hours a day. Thus, for example, a pumper of a stripper well often resides on the premises of his employer. The pumper engages in oiling the pump each day and doing any other necessary work around the well. In the event that the pump stops (at any time during the day or night) the pumper must start it up again. Similarly, caretakers, custodians, or watchmen of lumber camps during the off season when the camp is

---

[1] No opinion for publication.

closed, live on the premises of the employer, have a regular routine of duty but are subject to call at any time in the event of an emergency. The fact that the employee makes his home at his employer's place of business in these cases does not mean that the employee is necessarily working 24 hours a day. In the ordinary course of events the employee has a normal night's sleep, has ample time in which to eat his meals, and has a certain amount of time for relaxation and entirely private pursuits. In some cases the employee may be free to come and go during certain periods. Thus, here again the facts may justify the conclusion that the employee is not working at all times during which he is subject to call in the event of an emergency, and a reasonable computation of working hours in this situation will be accepted by the Division.

### "Emergency Service

"8. In some cases employees may be subject to call after the completion of their regular working day; employees may be called upon after regular working hours to furnish emergency service to customers. If the employee is required to remain on call in or about the place of business of the company, the time spent should be considered hours worked. If on the other hand, the employee is merely required to leave word where he can be reached in the event of a call and is not tied down to any particular place, such time need not ordinarily be considered hours worked. The employee, however, should be considered as working at any time during which he is actually making a call and his hours worked would include all time traveling to and from such a call."

■ These interpretations, of course, are not statutory enactments or regulations made pursuant thereto, but represent merely the interpretation which the Department charged with the duty of administering the Act, put upon it, and while not binding on this court, as would be the statute or regulations, they are persuasive,

and are based upon the experience of those trained for the service. They therefore carry great weight. United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796; Miller Hatcheries, Inc., v. Boyer, 8 Cir., 131 F.2d 283.

■ Several of the District Courts and also the State Court of Appeals of Texas have had occasion to consider cases of pumpers similar to the one here, where conditions and hours they actually worked were involved, and the uniform ruling appears to have been that it was not the whole period during which the employee was subject to call, if anything happened to necessitate his attending the wells, during which he was within the meaning of the statute engaged in work, but the time actually spent in performing his duties. Cordell v. Wilcox Oil & Gas Co.,[1] U.S.D.C. Okl. Oct. 17, 1941; Woods v. Wilkerson, D.C., 40 F.Supp. 131; Walling v. Pine,[1] U.S.D.C.Okl. June 24, 1942; Perry v. Livermore, Inc., Tex.Civ.App., Amarillo, 165 S.W.2d 782; Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90, 91; Barker v. Georgia Power & Light Co., U.S.D.C.Ga. June 5, 1942.[1]

■ If the contention of plaintiff was correct that, because he was subject to call in an emergency during the twelve hours his employer was required to pay him for the full time, including one and a half the rate for all in excess of 40 hours, it would mean the difference between ability to operate and abandonment of strip wells, with the consequent unemployment and loss of production which might otherwise be had. It would seem that a reasonable interpretation of the law and the regulations, as found by the Board, entitled the employee to pay only for the time he actually worked or was in position to perform some service on which he was subject to call only when needed.

It follows that the demands of plaintiff should be rejected.

---

[1] No opinion for publication.