**HENDERSON BROS., Inc. et al. v. THE TIPPLE BOAT, NO. 2.**

**Law No. 1938.**

United States District Court,
N. D. West Virginia.

May 25, 1951.

Gordon D. Kinder and Gordon T. Kinder, Martins Ferry, Ohio, for Walter Jeffrey and Jeffrey Mfg. Co.

Charles P. Mead, Wheeling, W. Va., for Berry Supply Corp., Westinghouse Electric Supply Co., Henderson Bros., Inc., Indemnity Ins. Co. of North America, and Charles Zubik.

W. F. Keefer, Wheeling, W. Va., for Smith Steel Supply Co.

James A. Byrum, Wheeling, W. Va., for Wilson Equipment Repair Co.

Melvin W. Kahle, Wheeling, W. Va., for wage claimants.

BAKER, Chief Judge.

### Statement of Facts.

This suit in rem in admiralty is now before the Court on Exceptions of the intervening libelant, Walter Jeffrey, to the Report of Thomas H. Duval, the Commissioner in Admiralty, filed with the Court on April 13, 1951.

Summarized, the Commissioner, in his Report, finds that thirty-four (34) employees of Tipple Boat No. 2, the Jeffrey Manufacturing Company, Wilson Equipment and Repair Company, Westinghouse Electric Supply Company, Berry Supply Corporation, Smith Steel Supply Company, Charles Zubik, and Walter Jeffrey, are the owners of maritime lien claims against Tipple Boat No. 2, and that the order of priority as to payment of the lien claims is the order in which the claims are named in the foregoing listing.

The claimant, Walter Jeffrey, filed written Exception to the Commissioner's Report, and therein contends that with the exception of the claim of Charles Zubik in the amount of $485 for towing Tipple Boat No. 2 from a point in the Ohio River at or near Wheeling, West Virginia, to a location in the Monongahela River at a point near Morgantown, West Virginia, during the month of December, 1947, none of the claimants other than the claimant, Walter Jeffrey, are owners of maritime liens entitled to payment from the proceeds received from the sale of Tipple Boat No. 2.

The order of priority under the theory advanced by the claimant, Walter Jeffrey, is first, the payment of the towing claim of Charles Zubik, and second, the payment of the mortgage claim of Walter Jeffrey. The Walter Jeffrey mortgage claim is in the amount of $21,230, a sum in excess of the amount received from the sale of the vessel called the Tipple Boat No. 2.

The record indicates that the order of priority given the various claimants by the Commissioner correctly follows the maritime practice of allowing priority to lien claimants in the order in which they last performed services for or furnished supplies to the vessel.

The entire controversy between Walter Jeffrey and the claimants whose claims are ordered paid by the Commissioner involves a determination of the question of whether the operation of Tipple Boat No. 2 on the Monongahela River at a point four miles down river from Morgantown, West Virginia, from the month of December, 1947, until the Tipple Boat ceased its operation during the month of May, 1948, was a maritime operation.

Section 971 of the Federal Ship Mortgage Act, 46 U.S.C.A., provides that "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

There is no doubt from the record in this action that the claimant, Charles Zubik, towed the vessel called the Tipple Boat No. 2 from a point in the Ohio River near Wheeling, West Virginia, to a point approximately four miles down river from Morgantown, West Virginia, in the Monon-

gahela River during the month of December, 1947, and that the towing was done at the instance of the owner of the vessel. There is further no doubt that the thirty-four wage claimants mentioned in the Commissioner's Report performed services for Tipple Boat No. 2 and that the aggregate amount of the wage claims of the thirty-four employees is the sum of $2,665.64. It is also quite clear from the record that the Jeffrey Manufacturing Company, Wilson Equipment and Repair Company, Westinghouse Electric Supply Company, Berry Supply Corporation, and Smith Steel Supply Company, all furnished supplies, repairs or other necessities upon the order of the owner of the vessel or of a person authorized by the owner and that the supplies, repairs or other necessities represented by the claims of those claimants were repairs, supplies or other necessities instant to the operation of Tipple Boat No. 2.

The record indicates that Tipple Boat No. 2 is a floating barge that was converted into a coal washer; that the Tipple Boat, along with the vessel known as the King Coal, a floating dredge, was operated by the common owner of the two aforementioned vessels (Rivercoal, Inc.) in the Ohio River in the vicinity of Moundsville, West Virginia, and in the vicinity of Warwood, Wheeling, West Virginia. The King Coal dredged coal from the bottom of the Ohio River. The coal was washed on Tipple Boat No. 2, loaded from Tipple Boat No. 2 onto barges, and shipped via barges to its destination. Tipple Boat No. 2 was towed to a point in the Monongahela River approximately four miles down river from Morgantown, West Virginia, during the month of December, 1947. The Tipple Boat was a vessel licensed for "coasting trade" with the United States Customs Office in Pittsburgh, Pennsylvania, Stanley L. Jones being licensed as Master of the boat. The boat observed rules of navigation during its operation on the Ohio River and during its operation on the Monongahela River. Its lights were navigational lights and were displayed in accord with navigational requirements. While operating in the Monongahela River, the Tipple Boat was located at a point immediately off shore from a coal gob pile and was made fast through the use of "spuds" and wire cables extending from the boat to the shore. Coal was taken from the on shore gob pile by means of a crane to the Tipple Boat, was washed on the Tipple Boat and was loaded from the Tipple Boat onto barges. The operators of the barge tow boats received instructions from "deckhands" of the Tipple Boat regarding the placing of barges alongside of the Tipple Boat. The location of the boat in the Monongahela River near Morgantown was changed on at least one occasion. All of the coal washed on the Tipple Boat was transported to its destination through the use of barges by way of the Monongahela River. Employees of the Tipple Boat were covered by Longshoremen's Insurance under the requirement of the Federal Longshoremen's Act. The boat was licensed to operate on all inland rivers of the United States. Two of the witnesses who testified before the Commissioner, Everett Drennan, President of the company owning the boat, and Stanley L. Jones, Master of the boat, stated that it was necessary to have employees who could not only operate the tipple equipment, but who could protect the boat and other navigation on the river. Mr. Drennan, in his testimony, stated that if a man was employed on the Tipple Boat, his first duty was to protect the life and property on the river. In describing the various duties of employees of the Tipple Boat, Mr. Drennan said they consisted of "handling the spuds and the lines and seeing we had steam to blow whistle to warn other traffic on the river, seeing we had navigation lights out, and seeing that the men got safely to and from the boat to shore." During periods of high water in the Monongahela River the Tipple Boat employees had to go to and from the boat in a rowboat. The record further indicates that if the land lines and spuds failed to hold the Tipple Boat near the shore, it would have drifted down river and would have represented a great hazard to navigation in that the boat had no self-propelling mechanism. On at least one occasion the boat was moved along the bank from one position to another. The boat

510

was served with electricity by a line from the shore.

### Conclusions of Law.

The necessary elements instant to the allowance of a maritime lien in favor of employees of Tipple Boat No. 2, the Jeffrey Manufacturing Company, Wilson Equipment and Repair Company, Westinghouse Electric Supply Company, Berry Supply Corporation, Smith Steel Supply Company and Charles Zubik against Tipple Boat No. 2 are (a) that Tipple Boat No. 2 was a vessel as the word is used in the Ship Mortgage Act; (b) that the supplies were furnished upon the order of the owner or person authorized by the owner; and (c) that the vessel was being operated in furtherance of commerce or navigation at the time the supplies were furnished.

Counsel for Walter Jeffrey virtually conceded requirements (a) and (b), but contend that at the time in question the boat was not being operated in furtherance of commerce or navigation. It is their contention that it was temporarily withdrawn from commerce, and they likened it to a Great Lakes ore boat during the winter when the lakes are frozen.

For authority in support of the first of the above-mentioned propositions, namely, that Tipple Boat No. 2 was a vessel as the word is used in the Ship Mortgage Act, see Kibadeaux v. Standard Dredging Co., 5 Cir., 81 F.2d 670, which held that a dredge enrolled and licensed as vessel and which had been navigated from port to port was a vessel for the purpose of determining whether a deck hand injured by defect in appliances of dredge could recover in admiralty. Also see City of Los Angeles v. United Dredging Co., 9 Cir., 14 F.2d 364, which held that a large dredging barge having no propelling power, but capable of being towed at sea, was a "vessel."

There are many other cases holding that barges or dredges properly enrolled as vessels and operating from port to port on navigable streams are vessels in the sense that that word is used in the Ship Mortgage Act.

There is no doubt from the testimony introduced in this proceeding that the supplies furnished by the claimants here named were furnished upon the order of the owner of the vessel or of a person authorized by the owner, and there is further no doubt that the supplies were used for the operation of Tipple Boat No. 2 (See Record, pages 74, 78, 123 to 126, inclusive, and 152 to 160, inclusive.).

The Tipple Boat No. 2 is undeniably a vessel as that word is used in the Ship Mortgage Act. In the case of Butler v. Ellis, 45 F.2d 951, 955, decided by the Fourth Circuit Court of Appeals in the year 1930, Judge Parker, in his Opinion, said:

"It is contended in behalf of the trustee that the dredge was not a vessel within the meaning of the statute, and that, if it was, it was not occupying the position of a vessel, in that it was not engaged in a maritime employment. Neither of these positions, we think, is well taken. The dredge was not only afloat, but was designed and equipped for navigation. It transported from place to place the machinery used in dredging and was engaged in opening up a channel for navigation. It is well settled that under these circumstances it was a vessel within the meaning of the admiralty law, and, as such, subject to liens for wages and supplies. What was said by Judge Benedict in the case of The Pioneer (D.C.) 30 F. 206, 207, is directly in point. Said he: 'The dredge before the court in this case is adapted to be an instrument of transportation on navigable water, and was used in naval transportation when she transported from place to place the steam-shovel and engine, and maintained the same afloat on navigable water, while being used for the purpose of deepening channels. She is within the definition of a vessel given by the Revised Statutes, tit. 1, c. 1, for she is an artificial contrivance, used, or capable of being used, as a means of transportation on water. In my opinion, her legal status is that of a vessel.'

"In Saylor v. Taylor 4 Cir., 77 F. 476, 478, this court upheld maritime liens in favor of seamen for wages and of those who had furnished towage and supplies to a dredge engaged in cleaning out and deepening the channels of certain creeks tributary to the Potomac River. The court, speaking

through Judge Brawley, said: 'At first blush it would seem a stretch of the rule to hold a dredge and her accompanying scows to belong to the same class with ocean steamships. The idea of commerce does not come into the mind primarily in connection with such craft; but, when it is borne in mind that they are constructed to move upon the water, and nowhere else, and that, while thus moving upon the water, they are subject to all the rules that govern other water craft as to lights, collisions, etc., it will be seen that they have that mobility and capacity to navigate which are recognized as the prime elements in determining the subjects of maritime liens. And so it seems a stretch of the imagination to class the deck hands of a mud dredge in the quiet waters of a Potomac creek with the bold and skillful mariners who breast the angry waves of the Atlantic; but such and so far-reaching are the principles which underlie the jurisdiction of the courts of admiralty that they adapt themselves to all the new kinds of property and new sets of operatives and new conditions which are brought into existence in the progress of the world. Hence it is that in all times and in all countries those who are employed upon a vessel in any capacity, however humble, and whose labor contributes in any degree, however slight to the accomplishment of the main object in which the vessel is engaged, are clothed by the law with the legal rights of mariners, "no matter what may be their sex, character, station, or profession." * * *'

"The rule that dredges engaged in work in furtherance of navigation are vessels within the meaning of the maritime law, and as such are subject to maritime liens for wages and supplies furnished, is sustained by the overwhelming weight of authority. The Dredge A (D.C.) 217 F. 617; North American Dredging Co. v. Pacific Mail S. S. Co. (9 Cir.) 185 F. 698; Charles Barnes Co. v. One Dredge Boat (D.C.) 169 F. 895; McMaster v. One Dredge (D.C.) 95 F. 832; McRae v. Bowers Dredging Co. (C.C.) 86 F. 344; The Steam Dredge No. 1 (D.C.) 87 F. 760; The International (D.C.)

83 F. 840; The Starbuck (D.C.) 61 F. 502; The Atlantic (D.C.) 53 F. 607, and see other cases cited in note in 59 A.L.R. page 1343.

"The trustee relies upon certain cases involving dredges engaged in nonmaritime undertakings such as J. C. Penney-Gwinn Corp. v. McArdle (5 Cir.,) 27 F.2d 324, 59 A.L.R. 1342; In re Hydraulic Steam Dredge No. 1 (7 Cir.) 80 F. 545, and The W. T. Blunt (D.C.) 291 F. 899. Without passing upon the point involved in these cases, we think that they have no application here. The dredge here involved was engaged in an undertaking essentially maritime, viz., the dredging of the channel of the Intra-Coastal Waterway. The fact that it was required to cut a part of the channel of the waterway through the land is, we think, immaterial. It was at all times afloat in navigable waters, even while so engaged."

In the case of Gale v. Union Bag & Paper Corporation, 5 Cir., 116 F.2d 27, the Court held that barges lacking motive power or steering gear, and towed by tugs to bring raw materials to manufacturing plant from points in another state, were "vessels engaged in commerce on navigable waters of the United States," and hence barge tender employed thereon was a "seaman" excluded by statute from benefits of Fair Labor Standards Act of 1938. Fair Labor Standards Act of 1938, § 13(a) (3), 29 U.S.C.A. § 213(a) (z); 24 U.S.C.A. § 1; 33 U.S.C.A. § 901 et seq.; 46 U.S.C.A. § 713.

As to authority for the proposition that a deckhand working on a dredge is a "seaman" entitled to sue under the Jones Act, 46 U.S.C.A. § 688, see Pariser v. City of New York, 2 Cir., 146 F.2d 431.

A well considered case involving a dredging barge, having no propelling power, is that of City of Los Angeles v. United Dredging Co., 9 Cir., 14 F.2d 364. In that case the Court, in its Opinion, quoted from the decision styled The International, 3 Cir., 89 F. 484, wherein it was held that it was immaterial that the scows used with barges in dredging were to be laden with mud from the shovel or scoop of the dredge instead of

ordinary merchandise, for equally with the dredge they were vessels within the meaning of Section 3 of the Revised Statutes, 9 Fed.St.Ann. 2d Ed. 391, 1 U.S.C.A. § 3.

Also see Lowrimoore v. Union Bag & Paper Corporation, D.C., 30 F.Supp. 647.

The Tipple Boat No. 2 was being operated in furtherance of commerce at the time the supplies here considered were furnished.

In that towage is expressly mentioned in Section 971 of the Federal Ship Mortgage Act, the claim in the amount of $485 of Charles Zubik for towing Tipple Boat No. 2 is now allowed as a maritime lien payable from the proceeds received from the sale of the vessel.

The claim of Walter Jeffrey is a mortgage claim in the amount of $21,230 (but not a prior preferred mortgage) against the vessel by virtue of a mortgage dated the 26th day of June, 1947.

The cases distinguish between vessels engaged in maritime operations and nonmaritime operations. If the operation of Tipple Boat No. 2 on the Monongahela River was a maritime operation, the Commissioner's Report should be confirmed. If the operation of the vessel was nonmaritime, the claim of Charles Zubik for towing should be allowed and the claims of all other claimants against the vessel, including the mortgage claim of Walter Jeffrey, should be determined by application of the usual rules applicable to insolvents. Since the corporation owning the vessel has been adjudicated a bankrupt, no difficulty over priorities would arise.

Whether the operation of a vessel on inland waterways of the United States at any given time is or is not a maritime operation depends upon the facts in each individual case. Weighing the equities in the instant proceeding and considering the fact that the vessel here considered was licensed to be operated in the "coasting trade" on inland waterways of the United States; that its operation in the Ohio River in connection with the dredge known as the King Coal was a maritime operation; that it was moved from place to place along the Ohio and Monongahela Rivers and was operated from place to place along these rivers; that its "deckhands" and some of its other employees were river men experienced in rules of navigation relating to river traffic; that its mortgage and license to operate were recorded in the United States Customs House in Pittsburgh, Pennsylvania; that its employees were covered by the provisions of the federal Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq.; that the Tipple Boat would constitute a distinct hazard to river navigation if not manned by competent personnel; and that the mortgagor, Walter Jeffrey, did not record his mortgage in the Office of the Clerk of the County Court of Monongalia County, West Virginia (as he should have done if the operation of the vessel here considered was not a maritime operation), I conclude that the vessel known as Tipple Boat No. 2 was engaged in a maritime operation on the Monongahela River at a point about four miles down river from Morgantown, West Virginia, at the time the claims of the claimants abovementioned accrued, and I do, therefore, now confirm the Report of Thomas H. Duval, Commissioner in Admiralty, heretofore filed with this Court. The analogy to a lake boat during the winter does not apply. Such a boat is out of commerce for a more or less definite time; that is, for the duration of the cold weather. Its owner cannot move it until the ice breaks in the spring. It is immobilized by forces beyond its owner's control. The owner of Tipple Boat No. 2 could have cast off the lines and moved it at any time.

An order may be presented affirming the findings of the Commissioner. It should direct that the costs of the Reference, including an allowance of $700, to Thomas H. Duval, as his entire fee, be first paid. After this payment, the order should direct the payment of the liens according to their priorities, as found by the Commissioner.